**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

_____

RANI FRANOVICH )
6313 Winston Dr. )
Bethesda, MD 20817 )
 )
    Plaintiff, )
 )
      v. )    Case No. _____
 )
CHRISTOPHER T. HANSON, CHAIRMAN )
UNITED STATES NUCLEAR )
REGULATORY COMMISSION )
 )
    Defendant. )
_____ )

**COMPLAINT**
**(Discrimination, Retaliation, Retaliatory and Discriminatory Hostile Work Environment, and Constructive Discharge in Violation of the Title VII, Civil Rights Act)**

COMES NOW the Plaintiff, Rani Franovich, by and through her attorneys, Webster & Fredrickson, and for her Complaint in the above-captioned action states to this Honorable Court as follows:

**INTRODUCTION**

1. Plaintiff Franovich, a female, brings a discrimination, retaliation, discriminatory and retaliatory hostile work environment complaint that culminates in a constructive discharge complaint against the Defendant, the United States Nuclear Regulatory Commission (the "NRC").

2. Plaintiff Franovich is an engineer and former employee of the NRC, a highly technical Federal agency largely dominated by males.

3. Plaintiff Franovich has long suffered gender discrimination and retaliation.

1

4.      Beginning in 2016, Plaintiff Franovich filed a series of equal employment opportunity (EEO) complaints of gender discrimination and retaliation, including a 2019 class complaint of the same on behalf of all female employees in science, technology, engineering, and mathematics (STEM) positions at the NRC.

5.      In 2019, the EEO Commission ((EEOC) Administrative Judge David Norken conducted a six-day hearing of two of Plaintiff Franovich's EEO complaints, which were consolidated.

6.      In 2020, Plaintiff Franovich suffered further gender discrimination and retaliation and, in June 2020, she filed a fourth EEO complaint.

7.      In August 2020, Plaintiff Franovich prevailed on her consolidated EEO complaints of gender discriminations and retaliation.

8.      Among other remedies and damages, Judge Norken ordered the NRC to instate Plaintiff Franovich to a Branch Chief position substantively similar to one she had been denied in 2016 on the basis of sex.

9.      Shortly thereafter, the NRC escalated its retaliation against Plaintiff Franovich, forcing her to resign on January 30, 2021, in an attempt to evade the ordered remedy of instating Plaintiff Franovich into a Branch Chief position.

**JURISDICTION AND VENUE**

10.     This court has jurisdiction over this matter pursuant to U.S.C. § 2000e5(f)(3), and 28 U.S.C. § 1331.

11.     Venue is proper under MD Code, 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1391 as most of the acts complained of herein occurred in Montgomery County, Maryland.

12.     Plaintiff Franovich exhausted her administrative remedies, and the U.S. Nuclear Regulatory Commission issued a Final Agency Decision received on March 31, 2022.

13.     Plaintiff filed the instant action within thirty days of service and thirty days of receipt of the Final Agency Decision.

## PARTIES

14.     Plaintiff Franovich is an adult female citizen of the State of Maryland.

15.     Defendant Christopher Hanson is the Chair of the NRC and is sued in his official capacity.

16.     The NRC was created as an independent agency by Congress in 1974 to ensure the safe use of radioactive materials for beneficial civilian purposes while protecting people and the environment. The NRC regulates commercial nuclear power plants and other uses of nuclear materials, such as in nuclear medicine, through licensing, inspection and enforcement of its requirements.  The NRC is an employer within the meaning of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, et seq.

## FACTS GIVING RISE TO RELIEF

### Background

17.     Ms. Franovich began her NRC career on May 12, 1991, as a Grade 9, Engineering Series 0801. From there she worked her way up to a GG-15 (0801) position in the NRC's Office of Nuclear Reactor Regulation (NRR) in 2003. She entered NRC management as a Branch Chief in 2005 in NRR and had served in several Branch Chief positions in NRR over the following eight years.

18.     Ms. Franovich's technical competency, strong leadership and accomplishments were met with disapproval from many senior executives in NRR, who

3

labeled her, "harsh," "difficult to work with," and "difficult to work for" because she defined gender stereotypes. These labels stigmatized Ms. Franovich and were used as basis to reject her numerous applications for the NRC's Senior Executive Service (SES) Candidate Development Program (CDP) and SES positions on at least four occasions between the time she entered management in 2005 and 2013.

19.     From 2006 to present, Ms. Franovich applied to the SESCDP or directly to an SES position at the Agency on at least ten occasions. The Agency consistently denied Ms. Franovich admittance into the SESCDP despite her demonstrated strong leadership, technical competency, and the breadth and depth of her knowledge and experience gained over 28 years. This impeded her career advancement to the SES and significantly erodes her post-NRC retirement earning potential.

20.     In 2012, Ms. Franovich expressed interest to her supervisor, Ho Nieh, in a nine-month developmental assignment as Acting Deputy Director of Program Management, Policy Development and Analysis (PMDA) in NRR. Mr. Nieh, then Director of the Division of Inspection and Regional Support (DIRS) in NRR, informed Ms. Franovich that but the opportunity was given to a male, Chris Regan.

21.     In April 2013, John Lubinski, Ms. Franovich's mentor and a member of the all-male SESCDP application review panel for NRR, informed Ms. Franovich that she was not highly ranked as an applicant for the 2015 SESCDP class because she was perceived by some senior executives within NRR as a strong leader who "lives the values, walks the talk, and is much needed at the next [executive] level." He further explained that she was perceived by other executives as "harsh, difficult to work for, and difficult to work with," and that these perceptions negatively influenced the review panel's rating of her SESCDP application.

22.     On April 22, 2013, Dr. Jennifer Uhle, then Deputy Director, NRR, confirmed that senior executives in NRR disapproved of Ms. Franovich's non-conformance to gender stereotypes, that "they were threatened" by Ms. Franovich because of her strong leadership, extensive experience, broad knowledge, sound reasoning, and the ease with which she expressed informed opinions and articulated well-founded positions.

23.     On April 24, 2013, Tim McGinty, fellow member of the all-male SESCDP application review panel, confirmed that Ms. Franovich was not highly rated as an applicant for the 2015 SESCDP class because she was perceived by some senior executives as "harsh, difficult to work for, and difficult to work with." By others Ms. Franovich was viewed as a strong leader who "lives the values, walks the talk, and was needed at the next [executive] level." Mr. McGinty further confirmed that Ms. Franovich was stigmatized because of these polarized perceptions of her, and the stigma negatively influenced the Agency's review of her SESCDP application and ranking among other (predominately male) applicants.

24.     Subsequent to this feedback, Ms. Franovich perceived a glass ceiling and sought numerous positions outside of NRR to advance her career into SES.

25.     Beginning in August 2013, Mr. Nieh created a hostile work environment for Ms. Franovich, who applied for a rotational assignment in the Office of Nuclear Security and Safeguards (NSIR) to escape the hostility.

26.     In 2013 Ms. Franovich sought a path around the gender discrimination (based on gender stereotypes) and glass ceiling she encountered in NRR.

27.     On March 24, 2014, Ms. Franovich began a six-month rotational assignment as Chief of the Security Training and Support Branch (STSB) in the NRC's

Office of Nuclear Security and Incident Response (NSIR), where she was subjected to gender discrimination and retaliation (including threats of mortal violence) by her male subordinates, her management and the Agency.

28.    In or around June 4, 2014, Ms. Franovich applied for five SES positions within the Agency. She was denied an opportunity to interview for any of these positions. On August 4, 2014, Ms. Franovich met with Michael Cheok, who reviewed her application materials, to solicit feedback on how she could improve her application. Mr. Cheok informed Ms. Franovich that she received an A rating for her responses to "Professional/Technical Qualifications" but a B rating for all of her responses to "Executive Core Qualifications" (ECQs).

29.    On June 17, 2014, Mr. McGinty reiterated to Ms. Franovich that management perceptions of her were polarized. Half of the NRR leadership team perceived Ms. Franovich as being "harsh, difficult to work for, and difficult to work with." By contrast, the other half perceived Ms. Franovich as a "strong leader that lives the values, walks the talk, and is much needed at the next (executive) level." He stated that Ms. Franovich was stigmatized by this polarized view of her and, because of this stigma, she "would not have legs for the next [2017] SESCDP class but might have legs for the one after that."

30.    During her six-month assignment as Chief of STSB in NSIR, Ms. Franovich counseled multiple male subordinates for making disrespectful, sexist and threatening comments: "you are a jerk," "you are like an asshole cop," "you are not my wife," "you are not my mother," and "I'm former SWAT and I've killed people before."

31.     On or around August 12, 2014, Ms. Franovich applied for the 2017 SESCDP class with a slightly revised package that was responsive to the basis for her B-rating of the ECQs.

32.     On August 28, 2014, Michael Layton, Ms. Franovich's supervisor in NSIR, offered her a permanent position as Chief of the Nuclear Security Oversight Branch. Ms. Franovich accepted the offer under the condition that her SESCDP application, which she had just submitted through her permanent office in NRR, be reviewed by NSIR leadership.

33.     The following week Mr. Layton reneged on the offer of NSOB, entrapping Ms. Franovich in the STSB Chief position.

34.     In September 2014 Ms. Franovich reported the gender discrimination to her managers and to officials in the Office of the Chief Human Capital Officer (OCHCO).

35.     In October 2014, after Ms. Franovich complained of contra-power harassment by her male subordinates.

36.     On October 14, 2014, Mr. Laytong informed Ms. Franovich that he had reneged on the condition upon which she had accepted the position of Chief of NSOB.

37.     Ms. Franovich later learned that she was not admitted to the SES CDP structured interview and Office of Personnel Management (OPM) assessment process despite that fact that she was rated by NRR management as an A candidate (the highest rating). Only eight other NRR applicants received an A rating. All eight were men, and only these men were admitted to the structured interview and OPM assessment process.

38.     On October 27, 2014, Brian McDermott, Mr. Layton's supervisor and then Deputy Director of NSIR, requested NRC's Office of the Inspector General (OIG) to launch a retaliatory investigation of false allegations that Ms. Franovich sexually harassed

the same male subordinates she had (a) instructed to follow the Agency's time reporting and travel policies and (b) counseled for misconduct and their disrespectful behavior toward her.

39.    On January 12, 2015, the Agency informed Ms. Franovich she was not selected for a structured interview or Office of Personnel Management (OPM) assessment for further vetting as an applicant to the SESCDP. Ms. Franovich subsequently learned that only eight applicants from NRR received an A rating, the highest rating possible. Ms. Franovich was among them and was the only female applicant from NRR. Unlike her seven male counterparts, Ms. Franovich was denied further consideration for admission to this developmental program, which impeded her advancement into executive leadership.

40.    On July 9, 2015, Ms. Franovich informed Ms. Cohen that the Agency discriminated against her based on her gender and non-conformance with gender stereotypes. Ms. Cohen confirmed that Ms. Franovich was rated an A candidate for the 2017 SESCDP class and yet was denied an opportunity to interview for the SESCDP or undergo the OPM assessment.

41.    On July 21, 2016, Ms. Franovich applied for three vacant branch chief positions in the Division of Construction Inspection Projects (DCIP), Office of New Reactors (NRO). On September 8, 2016, Michael Cheok, then Director of DCIP/NRO, informed Ms. Franovich that, despite being qualified for three vacant Branch Chief positions in DCIP, and despite her ten years of supervisory experience, she was not selected for any of the vacant supervisory positions. Mr. Cheok selected Vic Hall, a male with no supervisory experience, for the position she was best qualified for. Mr. Cheok informed Ms. Franovich that she is perceived as being "too hard on people" and reminded

8

her that other senior executives had provided this same feedback (that she is perceived as "harsh", "difficult to work for", and "difficult to work with") to her in the past.

42.     During multiple mentoring sessions with Ms. Franovich on multiple occasions, including January 26, 2015, and August 3, 2016, Mr. Lubinski confirmed the persistence of the stigma based on gender stereotypes.

43.     On September 15, 2015, and after a protracted investigation of Ms. Franovich, the NRC's OIG substantiated false accusations (by the same male subordinates with conduct issues) that Ms. Franovich sexually harassed them.

44.     On December 17, 2015, Mr. McDermott proposed to suspend Ms. Franovich for 10 days based on OIG's retaliatory investigation of her and substantiation of false allegations by her male subordinates that she had sexually harassed them.

45.     On January 24, 2016, Mr. McDermott reassigned Ms. Franovich to a non-supervisory position based on the retaliatory OIG investigation and findings, which reversed her career trajectory into senior executive leadership an indelibly damaged her professional reputation.

46.     On April 7, 2016, Ms. Franovich filed her first formal EEO complaints of gender discrimination and retaliation.

47.     On May 16, 2016, the NRC issued a Decision to Suspend Ms. Franovich for five (5) days based on the retaliatory OIG investigation and findings. Ms. Franovich amended her formal EEO complaint accordingly.

48.     On July 21, 2016, Ms. Franovich applied for a Branch Chief position in NRC's Office of New Reactors (NRO). The NRC selected a male with no supervisory experience and inferior qualifications to Ms. Franovich for a Branch Chief position.

49.     On September 8, 2016, Michael Cheok, the selecting official, informed Ms. Franovich that she was not selected because she is "too hard on people" and reminded Ms. Franovich that she had heard this feedback before: that she is "harsh, difficult to work for, and difficult to work with." On September 8, 2016, the

50.     Mr. Cheok's reiteration of these persistent management perceptions of Ms. Franovich confirmed that gender-based discrimination (gender stereotypes) and retaliation, vice merit, continued to form a basis for employment decisions that adversely affected her, including (a) non-selection to the 2015 and 2017 SESCDP classes; (b) disciplinary action on January 24, 2016, to remove her from her supervisory position based on allegations the Agency knew to be false; and (c) personnel selections that kept her out of management.

51.     On December 8, 2016, Ms. Franovich filed her second EEO complaint for discriminatory non-selection based on sex (gender stereotypes).

52.     By 2018, Ms. Franovich had applied to the NRC's SES CDP and to SES positions on at least ten occasions. She was consistently denied admittance despite her demonstrated strong leadership; technical competency; and the breadth and depth of her knowledge, experience, skill and demonstrated capability.

53.     In April 2018, the Agency interfered with the voting process for Chair of the Federal Women's Program Advisory Committee (FWPAC), for which Ms. Franovich was the sole nominee until the eleventh hour. Although Ms. Franovich was serving as the Chair of FWPAC just before votes were cast, the Agency ensured Dr. Christina Leggett would be named the next Chair of FWPAC and proceeded to use Dr. Leggett as a cat's paw to retaliate against Ms. Franovich and censor the FWPAC Focus Newsletter, for which Ms. Franovich was the Editor.

54.     In response to a request for the voting records under the Freedom of Information Act (FOIA), the NRC produced only 15 of the votes that were solicited from 22 FWPAC members. Of the 15 votes the Agency produced, 7 were cast for Ms. Franovich and 8 were cast for Dr. Leggett, implying that Ms. Franovich lost by a margin of one vote. Ms. Franovich contended that the NRC limited its production to only 15 votes and suppressed the remaining 7 votes to (a) conceal its interference in the election process and (b) install Dr. Leggett to silence FWPAC's critical analysis of NRC's gender demographics and under-representation of STEM women in NRC's workforce and leadership ranks.

55.     On January 18, 2019, Ms. Franovich initiated EEO counseling for a class complaint of gender discrimination with the Office of Small Business and Civil Rights (SBCR). On January 30, 2019, Ms. Franovich met with Joel Kravetz, Civil Rights Program Manager, to summarize her complaint on behalf of all female employees in STEM fields at the NRC.

56.     Two days later, on February 1, 2019, Mr. Kravetz's supervisor, Melody Fopma, fabricated pretext to retaliate against Ms. Franovich by falsely accusing her of making improper requests for documents and acting unprofessionally. Dr. Leggett acted as a cat's paw when she cited baseless excuses for removing Ms. Franovich from her leadership position as FWPAC's Co-chair of the Communications Sub-committee.

57.     On February 1, 2019, Ms. Franovich informed Dr. Leggett that "the manufactured pretext for retaliation was expected... and delivered right on time." Ms. Franovich copied Margaret Doane, then the NRC's Executive Director for Operations and former NRC General Counsel, on her email to Dr. Leggett.

58.     On February 4, 2019, and in response to an accusatory email from Dr. Leggett on February 3, 2019, Ms. Franovich asked Dr. Leggett to "please remove me from the FWPAC distribution. After receiving your email Friday (attached) – two days after meeting with SBCR to summarize her class action lawsuit against the NRC for gender discrimination and retaliation on behalf of all female employees in STEM fields – I withdraw from FWPAC, effective immediately."

59.     On March 28, 2019, Ms. Franovich filed a third EEO complaint of systemic, institutionalized gender discrimination and retaliation on behalf of all female NRC employees in science, technology, engineering and mathematics (STEM) positions (class complaint).

60.     In 2019, an EEOC Administrative Judge conducted a hearing of Ms. Franovich's first and second formal EEO complaints of gender discrimination and retaliation, which had been consolidated under one hearing.

### *Ms. Franovich Engaged in Protected Activity and Suffers Immediate Retaliation*

61.     On January 29, 2020, Joseph Anderson, Chief of the Reactor Licensing Branch (RLB), Division of Preparedness and Response (DPR), Office of Nuclear Security and Incident Response (NSIR), sent an email to Ms. Franovich implying she had failed to apprise him that an "EPZ discussion is again listed for discussion at 2nd ½ day session along with source term methodology."

62.     Mr. Anderson tampered with prior email correspondence, deleting all communications between himself and Ms. Franovich indicating that the topic had been cancelled, and copied Clay Johnson, Deputy Director of DPR/NSIR; Kathy Brock, Director of DPR/NSIR; Michael I. Dudek, Chief of the New Reactor Licensing Branch

12

(NRLB), Division of New and Renewed Reactors (DNRL), Office of Nuclear Reactor Regulation (NRR); Robert Caldwell, Deputy Director, DNRL; and Anna Bradford, Director, DNRL, in an evident attempt to undermine Ms. Franovich in front of senior management.

63.    Mr. Anderson further implied that Ms. Franovich attempted to exclude Ray Hoffman, a member of his staff, from the discussion despite Ms. Franovich's agreement on January 16, 2020, to include Mr. Hoffman for training purposes, and Mr. Hoffman's acceptance of her meeting invitation on January 28, 2020.

64.    Although Ms. Franovich was diplomatic in her response and reminded Mr. Anderson of their recent correspondence regarding subsequent changes to the agenda, Mr. Anderson and his executive managers (Ms. Brock and Mr. Johnson) neither acknowledged nor apologized for Mr. Anderson's gross error and poor judgment in sending the email to Ms. Franovich, loaded with aspersion and distributed to multiple senior executives, when a phone call to Ms. Franovich would have been prudent.

65.    On January 30, 2020, Ms. Franovich asked her management (Mr. Dudek, Mr. Caldwell and Ms. Bradford) to seek an acknowledgement of error by Mr. Anderson or his managers. None of Ms. Franovich's managers responded to Ms. Franovich.

66.    On February 12, 2020, Ms. Franovich requested a "status of DNRL management's feedback to NSIR regarding Joe's gross error, poor judgement and consequential organizational churn." Ms. Bradford responded that she and Ms. Brock had concluded two weeks before that Mr. Anderson "seemed to be confused about the topics of the meeting and that his questions were not intended to be accusatory," essentially excusing and condoning Mr. Anderson's undermining behavior toward Ms. Franovich.

13

67.    On March 6, 2020, Mr. Dudek disapproved of an email from Ms. Franovich responding to an email from Wade Mattox, Senior Security Manager, General Electric – Hitachi Nuclear Energy (GEH), and Dante Johnson, Chief of the Security Performance Evaluation Branch (SPEB) in NSIR. In her email, Ms. Franovich urged timely responsiveness to Mr. Mattox's request for NRC documents. Mr. Dudek thought the email could be interpreted negatively.

68.    On March 6, 2020, Mr. Dudek apologized to Mr. Johnson for Ms. Franovich's email.

69.    On March 10, 2020, Mr. Dudek approached Ms. Franovich in her open cubicle to provide "feedback" that her email to Mr. Johnson was "not nice" and "too negative." Mr. Dudek's criticisms could be heard by anyone in hearing range and should have been discreetly shared with Ms. Franovich in a closed office, which he occupied. Mr. Dudek characterized his criticisms as "feedback" and never referred to them as verbal counseling.

70.    On March 10, 2020, Ms. Franovich described her email as directing and authoritative. She asked Mr. Dudek if his perception of her email as "not nice" and "too negative" was influenced by Ms. Franovich's gender and stereotypes of women as being nurturing, accommodating and nice rather than directing and authoritative, traits generally associated with strong, male leaders.

71.    Mr. Dudek accused Ms. Franovich of having "unconscious bias toward NSIR."

72.    When Ms. Franovich asked him to explain this assertion, he based it on the offense she took from Mr. Anderson's email and her "not nice" and "too negative" email to Mr. Johnson. Ms. Franovich observed that Mr. Dudek was holding Mr. Anderson

14

(male) to a low standard of propriety while castigating Ms. Franovich (female) for speaking honestly to him about NSIR's organizational failures, and that this practice of disparate treatment is discriminatory based on gender.

73.    Ms. Franovich further explained that she was attacked by NSIR subordinates in 2014 and that Mr. Anderson's undermining behavior was just the latest example of aggression she has been subjected to by NSIR staff and management.

74.    Ms. Franovich urged Mr. Dudek to examine his own gender bias and included links to articles and a scholarly paper on gender discrimination based on gender stereotypes.

75.    She also reiterated the double standard applied to herself and Mr. Anderson and management's failure to intercede on her behalf.

76.    On March 12, 2020, Ms. Franovich submitted to Mr. Dudek a request for official time to engage in protected EEO activity, specifically to review a motion from outside counsel to certify a class.

77.    Mr. Dudek requested an explanation of the motion, and Ms. Franovich explained that she is one of three class agents who filed had a class complaint of gender discrimination and retaliation on behalf of all NRC women in STEM positions. Mr. Dudek approved the request.

78.    On March 12, 2020, Ms. Franovich responded to an email from Ms. Bradford regarding Mr. Mattox's request for documents and included the actual list of mostly NRC documents he requested.

79.    Ms. Franovich recounted the events, her candid assessment of NSIR's organizational challenges and failure to be responsive to the request, and Ms. Franovich's actions as the Senior Project Manager to prompt NSIR to action.

80.    Ms. Bradford responded "Now that I see the list of documents, you're right that I now understand why we would be the ones to provide them to GEH. I understand that this process has been frustrating."

81.    Although Ms. Franovich shared her candid assessment with only her management, Mr. Dudek replied on March 12, 2020, "… phrases used in your email below that describe NSIR as bungling, blew it, exasperated, dysfunctional, and feckless do not ascribe to the NRC's ISOCCER organizational values. This feedback is akin to my feedback given to you on Tuesday (3/11/20) regarding your email to Dante Johnson of NSIR," insinuating that Ms. Franovich had used those or similar phrases in her email correspondence with Mr. Johnson.

82.    Mr. Dudek copied Mr. Caldwell, Ms. Bradford and Robert Taylor, Deputy Director of NRR, in his accusatory email, exhibiting the same undermining behavior as Mr. Anderson.

83.    This accusatory email came days after Plaintiff Franovich raised concerns of gender bias to Mr. Dudek.

84.    Ms. Franovich opposed the insinuation and defended her right to raise concerns about organizational dysfunction and gender discrimination to management's attention without fear of retaliation.

85.    On March 12, 2020, Mr. Dudek responded to Ms. Franovich's March 10, 2020, follow-up email with manufactured "takeaways" in attempt to misrepresent the March 10, 2020, discussion. Ms. Franovich opposed Mr. Dudek's contrived "takeaways" and corrected his inaccurate account.

86.    Ms. Franovich maintained that she was factual in informing her management of organizational challenges in NSIR, including those Mr. Mattox (the

16

applicant) had brought to her for resolution as the Senior Project Manager for GEH's BWRX-300 design review.

87.    Ms. Franovich also reminded Mr. Dudek of their discussion and correspondence regarding gender bias and discrimination based on gender stereotypes.

88.    Just two weeks later, on March 26, 2020, Mr. Dudek blindsided Ms. Franovich with a counseling memorandum that mis-represented and exaggerated their interactions as pretext for retaliation against Ms. Franovich after she raised concerns of gender discrimination based on gender stereotypes.

89.    To wit, Mr. Dudek included Ms. Franovich's memorialized accounts of their discussion of gender discrimination based on gender stereotypes as supporting basis for the retaliatory counseling memorandum.

90.    Mr. Dudek bypassed progressive discipline protocols and made sweeping and baseless accusations that Ms. Franovich: (a) "deliberately did not follow Branch Chief guidance in communicating via email; (b) engaged in verbal and written communication that was not in accordance with NRC's ISOCCER values; (c) demonstrated unprofessional behavior by providing hostile, demeaning, and disrespectful communications to supervisory staff, and (d) displayed unprofessional behavior in the above referenced emails and during a face-to-face feedback discussion on March 10, that was overheard by [her] peers sitting around [her]."

91.    Mr. Dudek implied that Ms. Franovich had raised her voice during those discussions when, in fact, he had approached her in her open cubicle to discuss his criticisms of her email within hearing range of her work colleagues.

92.    On April 7, 2020, Ms. Franovich and Mr. Dudek were alerted by the Computer Security Incident Response Team (CSIRT) of a potential leak of sensitive

information. Mr. Dudek immediately responded "this is potentially very serious" and accused Ms. Franovich of "sending several potentially sensitive GEH documents (some labeled OUO) to her private Comcast account." He copied Mr. Caldwell and Ms. Bradford on this email.

93.     On April 9, 2020, Mr. Dudek "remain[ed] concerned" over three documents, none of which contained sensitive information.

94.     Mr. Dudek acknowledged that no leak had occurred yet persisted in retaliating against Ms. Franovich by indicating "she [undersood] that it was improper to send the email in question to her personal Comcast email account" and that Ms. Franovich had been "appropriately counseled so as not to perform this action again."

95.     Neither of these statements were truthful; Ms. Franovich properly transmitted non-sensitive exhibits supporting her EEO Complaint of gender discrimination and retaliation.

96.     On April 9, 2020, Mr. Dudek transmitted a counseling email to Ms. Franovich acknowledging that there was no spill but then claiming it was a "close call" as pretext to further retaliate against her.

97.     In his counseling email, Mr. Dudek asserted that "sending agency-related information to a personal email account is prohibited." With full knowledge that Ms. Franovich is an agent of the class complaint against the Agency, and that she raised concerns of his own gender bias to him on March 9, 2020, Mr. Dudek further instructed her to "Please do not send any additional emails to your personal Comcast email account with work-related information."

98.     Again, Mr. Dudek copied Mr. Caldwell and Ms. Bradford on the counseling email.

99.   On April 9, 2020, Ms. Franovich requested Mr. Dudek to explain the alleged impropriety and cite support for the alleged prohibition.

100.   She also advised Mr. Dudek that his instruction to "not send any additional emails to your personal Comcast email account with work related information" interfered with her ability to participate in the EEO Complaint process. Mr. Dudek was non-responsive to Ms. Franovich's requests.

101.   On April 13, 2020, Ms. Franovich contacted SBCR with an informal EEO Complaint of gender discrimination and retaliation.

102.   On April 22, 2020, Ms. Franovich informed Ms. Bradford and Mr. Caldwell that Mr. Dudek's actions and behavior were discriminatory (based on gender), retaliatory and obstructed the EEO complaint process. She requested their attention to this matter.

103.   On April 28, 2020, the Agency lifted Mr. Dudek's prohibition and interference with Ms. Franovich's ability to prepare all exhibits that supported her complaint.

104.   On April 28, Ms. Franovich reiterated to Mr. Caldwell that Mr. Dudek's persisted in retaliating against her, creating an unsafe work environment.

105.   Nevertheless, Ms. Franovich continued to endure retaliation by Mr. Dudek in the form of manufactured insinuations and slights in emails to her and copied to Ms. Bradford and Mr. Caldwell.

106.   Mr. Caldwell (Ms. Franovich's second-level supervisor), Ms. Bradford (Ms. Franovich's third-level supervisor) and Mr. Taylor (Ms. Franovich's fourth-level supervisor) were copied on much of the email correspondence, and privy to the circumstances that gave rise to the Counseling Memorandum, yet they took no corrective or preventative action.

107.    On June 25, 2020, and to protect herself from a persistent patter of gender discrimination and retaliation against her, Ms. Franovich filed a fourth complaint of gender discrimination and retaliation.

108.    Over the course of the ensuing five months, Ms. amended her complaint four times to include escalating occurrences of retaliation against her.

109.    July 17, 2020, Mr. Dudek escalated his retaliation against Ms. Franovich with baseless criticisms of her work performance.

110.    When Ms. Franovich defended herself against Mr. Dudek's criticisms, he pounded his fists on a desk or table and insisted she had violated Agency policy or failed to meet undefined management expectations. Mr. Dudek's escalated his retaliation to physical hostility toward Ms. Franovich.

111.    On July 17, 2020, and in light of conflicts of interest at the NRR deputy director (Mr. Taylor) and NRR director (Mr. Nieh) levels, Ms. Franovich began drafting an email to Daniel H. Dorman, then the NRC's Deputy Executive Director for Reactor and Preparedness Programs, to seek his assistance of providing relief from an untenable work environment.

112.    On July 21, 2020, Ms. Franovich invoked the NRC's open-door policy and sent an email to Mr. Dorman, with copy to Ms. Doane, the NRC's EDO and Mr. Dorman's supervisor, seeking Mr. Dorman's intervention and relief from an untenable work environment.

113.    Ms. Franovich further informed Mr. Dorman that Robert Caldwell, then Deputy Director, Division of New and Renewed Licenses (DNRL), NRR, and Anna H. Bradford, then Director, DNRL, NRR, were informed of the gender discrimination and retaliation yet failed to correct it.

20

114.    The following day, on July 22, 2020, rather than receiving a response from Mr. Dorman, Ms. Franovich received an email from OCHCO labor relations specialist Yvonne Weed, who was implicated in Ms. Franovich's prior EEO complaints of gender discrimination and retaliation, in which Ms. Weed introduced herself and indicated she and Ms. Bradford would be conducting a "management inquiry" into a branch meeting on July 21, 2020. Ms. Franovich would later learn that Ms. Bradford and Ms. Weed launched a "management inquiry" of alleged unprofessional behavior by Ms. Franovich.

115.    On July 27, 2020, Ms. Franovich responded with questions about the process. The reply was not responsive to Ms. Franovich's questions.

116.    On July 28, 2020, Ms. Franovich responded to Ms. Weed:

*Yes, we are acquainted through my complaints against the NRC of gender discrimination and retaliation. You may recall being deposed by Natalie Koss, Esquire, and examined by her at a hearing before an EEOC administrative judge not long ago. I am unfamiliar with a "management inquiry" and, naturally, I have a few questions:*

*1. What specific matter is the subject of (or reason for) the inquiry?*
*2. Whom in management decided to initiate the inquiry?*
*3. Why did management decide to conduct an inquiry?*
*4. What person(s) is(are) the subject of the inquiry?*
*5. Under what process and procedure is the inquiry being conducted?*
*6. Why have I been identified as someone who may have pertinent information?*
*7. Whom else has been identified as a person with pertinent information?*

117.    On July 28, 2020, Ms. Bradford responded that she and Ms. Weed were "merely gathering information on "some conflict at the branch meeting" yet evaded questions about the "management inquiry" process.

118.    On July 28, 2020, Ms. Franovich replied to Ms. Bradford's evasive responses to her questions:

21

*Anna,*

*As you are aware, I have complained multiple times to you and Mr. Caldwell about Mr. Dudek's gender bias, his admitted preference for uniformity over diversity, and his persistent retaliation against me (starting with a counseling memorandum) for bringing his gender bias to his attention in March 2020. Despite my multiple complaints of continued retaliation through manufactured pretext to levy accusations against me, Mr. Dudek's behavior remains unchecked... and the hostility continues to escalate in the wake of ineffectual intervention.*

*On June 25, 2020, outside counsel filed a formal EEO complaint against the Agency (on my behalf) of gender discrimination and retaliation by Mr. Dudek. The Agency overlooked or misplaced the complaint until I spoke with Stephen Smith, SBCR, on July 8, 2020, and assured him it was submitted. The Agency finally acknowledge receipt of the formal complaint on July 14, 2020. Three days later, on July 17, 2020, Mr. Dudek escalated his retaliation to physical hostility by audibly pounding his fists on his desk/table as he accused me of not following "the process" for interfacing with ACRS. I immediately withdrew from the skype call.*

*Mr. Dudek then used the NRLB branch meeting on July 21, 2020, to continue the discussion after he had already lobbied other branch members for support of his newly disclosed "expectations" regarding ACRS interface. When I offered my views and opposed his baseless accusations and hostility during the branch meeting, Mr. Dudek proceeded to speak over me and cut me off. When I opposed his attempt to shut me down he accused me of mishandling ACRS slides. When I opposed this accusation, he again cut me off and said: "Rani, did you or did you not send corrected slides to the ACRS," essentially putting me on trial before my peers for using proper judgment and defending myself against his openly hostile attacks."*

*On July 21, 2020, in light of conflicts of interest at the NRR deputy director and director levels, I elevated my concerns of an untenable work environment to OEDO. The following day (July 22), rather than receiving a response from OEDO, I was informed of a "management inquiry" into "some conflict at the July 21, 2020 branch meeting." I am well aware of the Agency's use of OCHCO "inquiries" and OIG investigations as instruments of retaliation against employees who complain. This practice was exposed during litigation since 2016 and a 2019 hearing before an EEOC administrative judge. To ensure my communications are neither mis-represented nor embellished to fabricate additional pretext to retaliate against me, I submit this narrative. If you and Ms. Weed have questions that are not answered herein, submit them to me in writing. I will respond in kind.*

119. Despite Ms. Franovich's stated distrust of an undefined "management inquiry" process and her offer of a written account of events leading up to and during the July 21, 2020, branch meeting, Ms. Bradford insisted on interviewing Ms. Franovich on July 30, 2020. Ms. Franovich would later learn that her written account was discussed, but not included, in a report by Ms. Bradford and Ms. Weed, who effectively suppressed Ms. Franovich's written account of a pattern and practice of retaliation enabled by her management chain up to and including Mr. Dorman and Ms. Doane.

120. On July 30, 2020, Mr. Dorman declined to meet with Ms. Franovich citing the "management inquiry" as basis to deny her relief.

121. On August 12, 2020, after a six-day hearing on liability and based upon testimony from fifteen (15) witnesses, as well as an extensive record of evidence, the EEOC Administrative Judge issued his Liability Decision on Ms. Franovich's prior EEO complaints, EEOC 531-2017-00173X (Case NRC-16-13) and EEOC 531-2017-00366X (Case NRC-17-05).

122. The EEOC Administrative Judge made numerous findings of fact and concluded that Ms. Franovich was subjected to sex discrimination when (a) the Agency failed to consider the sex-based discriminatory motives of Ms. Franovich's male staff and (b) the Agency did not select her for the NRO Branch Chief position for which she was most qualified.

123. The EEOC Administrative Judge also found that it was reprisal when the Agency refused to consider credible testimony of sex discriminatory motivations and increasing the penalty for Ms. Franovich's alleged "unwanted touching."

124. In his August 12, 2020, Liability Decision, the EEOC Administrative Judge ordered the NRC to instate Ms. Franovich to a Branch Chief position substantively similar

to the one for which she was not selected. He also ordered the NRC to post notices of his findings in conspicuous places that NRC employees and applicants for employment would easily find them.

125.    Also on August 14, 2020, Ms. Franovich requested 30 hours of official time to respond to time-critical requests from an EEOC Administrative Judge (AJ) and prepare for and attend an impromptu damages hearing. On August 20, 2020, and in light of time already expended to comply with the AJ's orders, Ms. Franovich amended her request from 30 to 70 hours for the two-week pay period (August 16-29, 2020). Contrary to Agency policy, the Branch Chief, NRLB, did not act on the request until 4:37 pm on August 21, 2020, and he approved only 24 hours for the entire pay period, presenting a challenge for Ms. Franovich to account for her time and to prepare for and attend the hearing.

126.    On August 27, 2020, the EEOC Administrative Judge issued his Damages Decision, awarding Ms. Franovich emotional distress damages amongst other remedies.

127.    On August 31, 2020, Ms. Franovich amended her June 25, 2020, gender discrimination and retaliation complaint to include the July 17, 2020, escalation of the retaliation to (a) baseless pretext for criticism of Ms. Franovich's work performance and (b) physical hostility by Mr. Dudek when Ms. Franovich defended herself against his fabricated criticisms.

128.    In her amended complaint, Ms. Franovich further informed Vonna Ordaz, the Director of SBCR, that Mr. Dudek's management "has long been apprised of a discriminatory, hostile work environment and has been ineffectual in correcting it."

129.    On August 31, 2020, Ms. Franovich submitted a request for official time to meet with her representative on September 3, 2020, to review a voluminous fee petition. Mr. Dudek approved the request.

130. Ms. Franovich estimated that the meeting would last six hours; however, it took seven hours to complete business with outside counsel. Ms. Franovich entered the actual time spent in this meeting in the Agency's time reporting system, consistent with governing policy.

131. On September 11, 2020, Mr. Dudek asked Ms. Franovich to revise the time she had entered for September 3, 2020. The time Ms. Franovich had entered was accurate and reflected actual time spent in a meeting with outside counsel.

132. Therefore, Mr. Dudek's insistence that Ms. Franovich revise it was unwarranted and antagonistic.

133. On September 11, 2020, Ms. Franovich appealed to Ms. Doane for intervention and relief from the hostile environment imposed by Mr. Dudek and enabled by Mr. Caldwell and Ms. Bradford. Ms. Doane took no action and provided no relief to Ms. Franovich.

134. Rather, on September 14, 2020, at 8:46 am, Ms. Doane informed Ms. Franovich that she had asked Mr. Dorman and Ms. Bradford to respond to Ms. Franovich's concerns about Ms. Bradford's participation in the Agency's retaliation.

135. Two hours later, on September 14, 2020, at 10:42 am, Mr. Dudek threatened to charge Ms. Franovich AWOL on September 3, 2020, if she did not revise her timecard.

136. When Ms. Franovich informed Mr. Dudek the timecard was accurate and appropriate in accordance with Agency policy, he directed an administrative assistant to charge Ms. Franovich AWOL for one hour September 3, 2020.

137. On September 14, 2020, Ms. Franovich again appealed directly to Ms. Doane for intervention and relief from the retaliation and recent charge of AWOL, and ongoing hostility by Mr. Dudek, enabled by Mr. Caldwell and Ms. Bradford.

138.   Ms. Doane took no action to remedy the ongoing retaliation or provide relief to Ms. Franovich.

139.   Rather, Ms. Doane referred Ms. Franovich's complaint about Ms. Bradford's failure to correct the retaliation directly to Ms. Bradford, exposing Ms. Franovich to further retaliation at the hand of Ms. Bradford.

140.   On September 17, Mr. Dudek rescinded the retaliatory AWOL charge yet persisted in accusing Complaint of being in violation of Agency policy.

141.   On September 22, 2020, the same day the Agency filed its opposition to Ms. Franovich's fee petition, Ms. Bradford responded for Ms. Doane. Ms. Bradford attempted to (a) misrepresent Ms. Franovich's concern regarding the Agency's retaliatory charge of AWOL and (b) shuttle Ms. Franovich's EEO complaints to OCHCO for investigation under the Agency's Anti-harassment Policy.

142.   On September 22, 2020, Ms. Bradford also informed Ms. Franovich that, despite the provision in the same Agency Anti-harassment Policy for implementing interim measures, Mr. Dudek would remain NRLB Branch Chief.

143.   On September 23, 2020, Ms. Franovich again informed Ms. Doane of ongoing mistreatment. Again, Ms. Doane took no action to remedy the ongoing retaliation or provide relief to Ms. Franovich.

144.   On September 24, 2020, at 11:45 am, Ms. Franovich filed her second amendment to the June 25, 2020, gender discrimination and retaliation complaint to include Mr. Dudek's (a) failure to timely approve her August 14 and 20, 2020, requests for 30 and 70 hours of official time, respectively, to respond to time-critical requests from an EEOC Administrative Judge (AJ) and prepare for and attend an impromptu damages hearing; and (b) August 21, 2020, approval of only 24 hours for the entire pay period,

26

presenting a challenge for Ms. Franovich to account for the time she had already spent preparing for and attending the August 27, 2020, damages hearing.

145.    Ms. Franovich's September 24, 2020, amended complaint described more recent incidents (including a retaliatory August 31, 2020, charge of absence without leave [AWOL] for engaging in pre-approved protected EEO activity) as "... examples of an ongoing pattern of hostility by Ms. Franovich's supervisor with the full knowledge of responsible management officials, up to and including [Ms. Doane] the NRC's Executive Director of Operations."

146.    Despite Ms. Franovich's appeals to these senior Agency officials for intervention and interim measures for relief, they failed to comply with the NRC's NRC's "Policy and Procedure for Preventing and Eliminating Harassing Conduct in the Workplace" (Anti-harassment Policy) and correct the retaliatory hostile environment or provide the requested (or any) interim measures and relief, allowing the hostile environment to continue and escalate.

147.    Mr. Dudek continued to obstruct Ms. Franovich's participation in the EEO process with the knowledge of Mr. Caldwell and Ms. Bradford, whom he frequently copied on his emails to Ms. Franovich, signaling their participation in the retaliation against her.

148.    Mr. Dudek, Ms. Bradford and Ms. Weed fabricated additional pretext to take action against Ms. Franovich through the NRC's conduct of a bogus "management inquiry" beginning in July 2020.

149.    Ms. Weed frequently served as the NRC's Designated Official (DO) for the Anti-harassment Policy, yet she and NRC attorney Lisa Schneiderman violated the NRC's Anti-harassment Policy by failing to take the actions for which they were responsible as defined in the Policy.

150.    On September 24, 2020, at 4:44 pm (one day after Ms. Franovich last appealed to Ms. Doane, hours after she filed her first amended complaint of gender discrimination and retaliation, and in continuation of retaliation against her) Mr. Dudek delivered a formal memorandum to Ms. Franovich that (a) mischaracterized facts and communications regarding Ms. Franovich's time accounting; (b) falsely accused Ms. Franovich of charging time erroneously or fraudulently; and (c) falsely alleged that Ms. Franovich charged official time for EEO activity that he "learn[ed of]... for the first time when reviewing [Ms. Franovich's] biweekly entries in HRMS that is used for payroll, budget, and fee-billing purpose" amongst seven other manufactured pretextual grounds to counsel Ms. Franovich.

151.    On October 19, 2020, Mr. Dudek transmitted by email NRC's assessment of Ms. Franovich's performance in Fiscal Year 2020. Ms. Franovich received a Fully Successful performance rating, which was a lower performance evaluation than she should have received based on her performance and the lowest performance rating she had received in over two decades of sustained outstanding and excellent performance – including her outstanding performance as a Project Manager between 2002 and 2003 and her excellent and outstanding performance as a supervisor of project managers between 2005 and 2008.

152.    When justifying this lower performance evaluation, Mr. Dudek largely ignored Ms. Franovich's written input, which supported a much higher rating. Mr. Dudek also omitted information regarding her workload, accomplishments, contributions, initiative, and leadership; and included narratives that were factually incorrect, incomplete, or misleading.

28

153. On October 27, 2020, Mr. Dudek explained to Ms. Franovich that she did not receive higher ratings because she disagreed with him 53 times during the rating period; he also cited numerous examples of her disagreements that involved matters Ms. Franovich raised in her pending EEO complaints of gender discrimination and retaliation and her elevation of complaints to senior Agency officials. Mr. Dudek essentially admitted to the Agency's reprisal against Ms. Franovich for invoking the NRC's Management Directive 10.160, "Open Door Policy;" raising her concerns to senior Agency officials under the NRC's Collective Bargaining Agreement (CBA), Article 2.10, "Open Door Policy, Non-concurrence Process, and Differing Professional Opinions Program;" and exercising her whistleblowing rights under the Energy Reorganization Act of 1974, as amended (42 U.S.C. 5801 et seq.).

154. On October 28, 2020, Ms. Bradford informed Ms. Franovich that: (a) she had completed a review of Ms. Franovich's July 21, 2020, complaint of physical hostility on July 17, 2020, by the Branch Chief, NRLB: (b) Mr. Dudek denied pounding his fists on a desk or table and was nervously tapping his fingers; (c) she believed Mr. Dudek's account; and (d) she proposed to suspend Ms. Franovich for 15 days for allegedly unprofessional conduct during a July 21, 2020, NRLB staff meeting.

155. Ms. Bradford's proposed 15-day suspension was based on (a) inaccurate or falsified summaries of interviews of Ms. Franovich's coworkers; (b) Mr. Dudek's retaliatory March 26, 2020, counseling memorandum to Ms. Franovich for opposing his gender bias; (c) the Agency's May 16, 2016, Decision to Suspend Ms. Franovich for five days, which EEOC Judge Norken found to be discriminatory based on sex and retaliation in his August 12, 2020, liability decision; and (d) inaccurate or false assertions by Ms. Bradford.

29

156. This proposed suspension was further retaliation against Ms. Franovich for engaging in protected conduct.

157. On November 2, 2020, Ms. Franovich filed her third amendment to the June 25, 2020, gender discrimination and retaliation complaint to include Mr. Dudek's September 24, 2020,

158. On November 13, 2020, Ms. filed her response to the proposed suspension to the deciding NRC official, Dr. Mirela Gavrilas.

159. On November 25, 2020, Ms. Franovich filed her fourth amendment to the June 25, 2020, gender discrimination and retaliation complaint to include Mr. Dudek's October 27, 2020, retaliatory performance appraisal and Ms. Bradford's retaliatory October 28, 2020, proposed 15-day suspension.

### *Retaliatory and Discriminatory Accusations Force Plaintiff Franovich to Resign*

160. Beginning in March 2020, Ms. Franovich complained of Mr. Dudek's gender bias, gender discrimination based on gender stereotypes, and his retaliation against her for opposing his gender-based discrimination.

161. The NRC failed to correct Mr. Dudek's discriminatory and retaliatory behavior, or separate Mr. Dudek from Ms. Franovich,

162. Ms. Franovich informed her chain of command (with the exception of Robert Taylor, who considers Mr. Dudek to be one of his best friends, and Ho Nieh, who is named in Ms. Franovich's class action lawsuit against the NRC) up to and including NRC's EDO Ms. Doane. Each senior management official failed to implement the NRC's Anti-harassment Policy and establish interim measures to protect Ms. Franovich from further harm and the Agency from further liability.

163.   On December 10, 2020, Rhonda Dorsey, Senior Civil Rights Specialist, SBCR, emailed Ms. Franovich's counsel to acknowledge Ms. Franovich's September 11, 2020, offer to participate in alternative dispute resolution (ADR) of Case NRC-22-20. Ms. Dorsey inquired if Ms. Franovich was still interested.

164.   Through her counsel, Ms. Franovich confirmed her continued interest and reminded Ms. Dorsey that, as a preliminary matter, interim measures had not yet been taken. He also reminded Ms. Dorsey that EEOC Judge Norken had ordered the Agency to instate Ms. Franovich in a branch chief position equivalent to one she was not selected for in 2016 based on sex discrimination and suggested that implementing EEOC Judge Norken's order would provide an interim measure for relief.

165.   On December 14, 2020, parties scheduled a mediation meeting for 10:00 am on December 21, 2020. Ms. Franovich immediately requested official time from December 17 through December 21 to prepare for and participate in the meeting. Mr. Dudek approved, then demanded a new approval form for arbitrary and capricious reasons not supported by the governing procedure, CR-109, "Official Time Policy during EEO Complaint Process."

166.   On December 16, 2020, Ms. Franovich appealed to Ms. Ordaz for assistance with Mr. Dudek's persistent retaliation and "arbitrary impediments to frustrate my engagement in the EEO process." Ms. Franovich also informed Ms. Ordaz that (a) Steven Smith, the EEO Program Manager in SBCR, was an accomplice to Mr. Dudek's retaliation; and (b) Mr. Dudek had, on two occasions, shared with Mr. Smith a September 24, 2020, memorandum on "Path Forward on Official Time (EEO) and HRMS Entries" despite its counseling tone and sensitive nature.

31

167.    Ms. Franovich further informed Ms. Ordaz that "Mr. Dudek's practice of constantly fabricating new rules to fuel his pedantic badgering is intolerable.

168.    On December 17, 2020, Ms. Ordaz and Ms. Franovich spoke about Ms. Franovich's concerns and a suitable branch chief position that would provide continuity in leadership of her assigned project, establish interim measures as required by the NRC's Anti-harassment Policy, and satisfy EEOC Judge Norken's order. Ms. Franovich emphasized to Ms. Ordaz that reassignment to a suitable branch chief position outside Ms. Bradford's organization was an interim measure, not a term for mediation.

169.    On December 18, 2020, Ms. Franovich sent an email to Ms. Ordaz memorializing their December 17, 2020, discussion. In this follow-up email Ms. Franovich elaborated on her proposal for a suitable branch chief position that would establish an interim measure, provide continuity in leadership over her assigned project and satisfy EEOC Judge Norken's order. During the December 21, 2020, conference with Ms. Dorsey, which was limited to a discussion of mediation process and scope, Ms. Franovich's attorney reiterated the importance of getting Ms. Franovich out of the ongoing hostile environment. Nevertheless, the Agency took no interim measures.

170.    On the afternoon of December 21, 2020, an EEO investigator sent a 23-page EEO investigative affidavit for NRC-22-20 with 185 questions to Ms. Franovich's work email address. Ms. Franovich was on annual leave and did not see the email until she returned to work on December 28, 2020.

171.    Ms. Franovich's priority that week was to correct errors and redact proprietary information she had identified in a safety evaluation report that George Wunder, a Senior Project Manager (PM) assigned to her project, had intentionally released to the public on or before December 17, 2020.

172.   The proprietary document remained in the public domain until December 18, 2020, when Ms. Franovich identified Mr. Wunder's reckless and deliberate spill of sensitive proprietary information and advised Mr. Dudek and Ms. Bradford to authorize removal of the document from the public domain.

173.   Upon returning to the office on December 28, 2020, Ms. Franovich prioritized recovery from the spill and correction of numerous technical errors.

174.   She requested an extension to complete the voluminous EEO Investigative Affidavit. Recovery from the spill of proprietary and inaccurate information was labor intensive and not completed until late Friday, January 8, 2021.

175.   On January 11, 2021, Ms. Franovich requested 10 hours of official time for that week and additional time the following pay period to complete the labor-intensive affidavit.

176.   On January 12, 2021, Mr. Dudek approved time for only January 13, 2021, and January 14, 2021, but not the following week.

177.   Beginning January 13, 2021, Mr. Dudek repeatedly interfered with Ms. Franovich's work on this protected and time-critical EEO activity with emergent and retroactive expectations.

178.   On January 13, 2021, while Ms. Franovich was responding to questions in the EEO investigative affidavit (for which she obtained pre-approval), Mr. Dudek arbitrarily insisted that Ms. Franovich attend an all-day (9:30 am to 5:30 pm) meeting with the Advisory Committee on Reactor Safeguards (ACRS) even though (a) her attendance was unnecessary, duplicative, and costly to the applicant; (b) Ms. Franovich had informed him on December 29, 2020, that she would not be attending for these

33

reasons; and (c) he was fully aware of her pre-approved plan to prepare responses to questions in the EEO affidavit on January 13.

179.    Ms. Franovich reminded Mr. Dudek of this on January 13, 2021. Mr. Dudek had raised no objection on December 29, 2020, yet he accused Ms. Franovich of not following his direction and insisted that she participate after he had just approved the day before (on January 12, 2021) 10 hours of official time for Ms. Franovich to work on the EEO investigative affidavit on January 13 and 14, 2021.

180.    Ms. Franovich complied with Mr. Dudek's request, deferred her work on the EEO investigative affidavit and joined the ACRS meeting at approximately 2:45 pm on January 13, 2021. This unnecessary disruption resulted in only three hours of official time for EEO activity on January 13, 2020.

181.    Because of the disruption on January 13, 2020, Ms. Franovich was forced to make up the lost time (two hours) on January 14, 2021, which was effectively reduced from a nine-hour to a seven-hour workday because she had worked ten hours the Friday before, exceeding her workday by two hours on January 8, 2021, to correct Mr. Wunder's errors.

182.    Ms. Franovich and Mr. Dudek reached agreement that she would account for that time and work only 7 hours on January 14, 2021. Mr. Dudek was aware, or should have been aware, that Ms. Franovich's workday on January 14 would be effectively reduced to 7 hours, all of which would now be focused on approved EEO activity.

183.    However, on January 14, 2021, Mr. Dudek requested that Ms. Franovich attend newly scheduled meetings even though he had just approved 10 hours of official time for her to work on the EEO investigative affidavit two days before.

184. Ms. Franovich did not receive his requests because she was attending to pre-approved protected EEO activity away from her NRC computer and home office (mandatory telework station because of COVID).

185. In January 2021, Ms. Franovich continued efforts to have the Administrative Judge's Order of instatement to a Branch Chief position followed and to have herself removed from the discriminatory and retaliatory hostile work environment.

186. Despite the Agency's stated interest in entertaining mediation discussion, it did not establish interim measures – a matter of more immediate concern. As a result, Mr. Dudek persisted in delaying approval of timely requests for official time for EEO activity, continued to interfere with protected EEO activity, and capriciously reneged on his approvals of official time for protected EEO activity.

187. In the latter half of January 2021, Mr. Dudek continued to interfere with Ms. Franovich's protected EEO activity. He attempted numerous times to obstruct Ms. Franovich's time-critical response to 185 questions in the 23-page EEO investigative affidavit related to NRC 20-22 and accused Ms. Franovich of failing to follow direction and violating the Agency's telework policy when she engaged in protected EEO activity for which official time was pre-approved.

188. On January 21, 2021, Ms. Franovich reminded Mr. Dudek of her timely request on January 11, 2021, for official EEO time during the weeks of January 18, 2021, and January 25, 2021. She informed him that his delay in responding to the request was impacting her ability to participate in the EEO process.

189. Mr. Dudek finally agreed to support Ms. Franovich's request but with arbitrary and subjective "contingencies" he established in coordination and collaboration with SBCR. These "contingencies" prioritized "NRC casework associated with [Ms.

35

Franovich's] assigned duties" and "scheduled meetings" over her time-critical EEO activity, which she had already deferred from December 21, 2020, to January 13, 2021, because she was on holiday leave and, upon returning, immediately attended to mission-critical recovery efforts, necessitating two extensions of time to complete her EEO investigative affidavit.

190.    Within less than two hours, on January 21, 2021, Mr. Dudek retroactively applied these "contingencies" to threaten and intimidate Ms. Franovich for using pre-approved official time on January 13-14, 2021, to prepare responses to the EEO investigative affidavit.

191.    Specifically, on January 21, 2021, Mr. Dudek sent an email, with copy to Mr. Caldwell and Ms. Bradford, accusing Ms. Franovich of being non-compliant with the "Agency's Official Time Policy," Article 7 of the Collective Bargaining Agreement, and Agency telework policies for being inaccessible.

192.    Mr. Dudek also accused Ms. Franovich of being non-responsive to his calls on January 13, 2021, and to his impromptu expectation that she attend the ACRS meeting. When Ms. Franovich had previously informed him on December 29, 2021, that she would not be in attendance, Mr. Dudek raised no objection.

193.    It was not until after Ms. Franovich requested and was approved time to work on her EEO investigative affidavit that Mr. Dudek changed his mind the morning of January 13, 2021, and communicated an expectation that she attend while she was engaged in protected EEO activity.

194.    Mr. Dudek further accused Ms. Franovich of being inaccessible on January 14, 2021, and for declining to participate in two meetings, both of which were emergent

36

and neither of which was characterized as "important" or mandatory until she was unavailable to attend them.

195.    Ms. Franovich contacted Getachew Tesfaye, who requested the meetings; expressed her thoughts on the meeting topic and explained why she would not be in attendance.

196.    While Ms. Franovich was responsive to Mr. Tesfaye, she declined to attend the meetings because they conflicted with pre-approved time to work on the time-critical EEO investigative affidavit. Mr. Tesfaye expressed appreciation for Ms. Franovich's outreach in advance and assured her that her attendance was not necessary since he understood and could represent her views (which were consistent with his own).

197.    On January 21, 2021, Ms. Franovich responded to Mr. Dudek's email (with copy to Mr. Caldwell and Ms. Bradford). Ms. Franovich wrote: "Your email below appears to (a) renege after approving official time; (b) disrupt my pre-approved work on the affidavit; and (c) antagonize me over retroactive expectations. These communications and expectations are not in accordance with the governing procedure, CR-109. The procedure neither states nor implies that I be tied to my NRC laptop when using official time to participate in the EEO process. Moreover, such an expectation would expose me to further disruption when I am attempting to be responsive to time-critical requests from the EEO investigator. In short, you continue to impede my ability to participate in the EEO process."

198.    In her January 21, 2021, response email to Mr. Dudek, Ms. Franovich further noted: "You will note a 1.5-hour charge to licensing administration for this effort to respond to your email. I will begin my approved official time at 4:15, reducing today's charge by 75 minutes that will be made up later. Be advised that I need to focus,

undisrupted, on this time-critical activity. For this reason (and in accordance with the governing procedure), I am not at my NRC workstation when I am preparing responses to the investigator's questions."

199.    Ms. Franovich expended significant effort preparing the email response and defending herself against Mr. Dudek's baseless accusations as pretext to retaliate took. This disruption elicited a PTS response and anxiety; it also further distracted her from attending to the EEO investigative affidavit.

200.    Prior to COVID19, EEO investigators met with complainants and witnesses and interviewed them. Those meetings could take hours without disruption by a management official – particularly a management official named in the complaint – for arbitrary and capricious reasons.

201.    The EEO investigator would take notes and later transfer those interview notes to an EEO investigative affidavit. The EEO investigator would then send the investigative affidavit to the Ms. Franovich (or witness) to review, share with counsel, correct, edit, and supplement as necessary before the Complainant (or witness) would execute and certify the affidavit.

202.    The COVID19 pandemic changed this practice. In lieu of an in-person interview, the EEO investigator prepared a series of questions in the format of an affidavit. The EEO investigator requested Ms. Franovich to prepare responses. The "interview" was effectively conducted in writing through email. Mr. Dudek and the Agency attempted to exploit this written "interview" to not only disrupt, frustrate, interfere with and obstruct the EEO investigation, but also to fabricate pretext to further antagonize, threaten, intimidate, retaliate and sustain a full-court press hostile work environment for Ms. Franovich.

203.   On January 22, 2021, Ms. Franovich's attorney informed the EEO investigator that Ms. Franovich would need an additional three weeks to complete the EEO investigative affidavit. Meredith Neubauer, Senior Civil Rights Specialist, SBCR, agreed to extend by an additional eight business days to February 3, 2021, and reminded Ms. Franovich's attorney that "Ms. Franovich is entitled to EEO Official Time to complete her affidavit."

204.   Ms. Franovich's attorney responded to Ms. Neubauer: "Ms. Franovich has requested official time but she has been met with resistance in having time approved in which she can dedicate all of her efforts to completing the affidavit.  Her supervisor, Mr. Dudek, has insisted that Ms. Franovich remain available for calls and other business during official time which requires her to remain at her NRC computer and phone for the duration.  Ms. Franovich has requested assistance in resolving that issue but no assistance has been forthcoming.  Nevertheless, February 3, 2021 is a very tight deadline provided the extent of the information required, but we think we might be able to meet a February 5, 2021 deadline and we request that we have an extension to that date."

205.   Thereafter, Mr. Dudek amplified his interference and hostility and continued to harass Ms. Franovich and attempt to obstruct her protected EEO activity during the week of January 25, 2021.

206.   Ms. Franovich had informed Mr. Dudek on previous occasions that (a) in 2014 she was attacked by security specialists in the Office of Nuclear Security and Incident Response (NSIR) and (b) she was diagnosed with post-traumatic stress (PTS) because of the 2014 attack. These matters are the subject of EEO case 531-2017-00173X for which Ms. Franovich was awarded emotional distress damages.

39

207. In February 2020, Ms. Franovich also complained to Mr. Dudek, Mr. Caldwell and Ms. Bradford of deliberate undermining behavior by Mr. Anderson, a supervisor in NSIR.

208. Nevertheless, on January 25, 2021, Mr. Dudek attempted to force Ms. Franovich to participate in a working group with security specialists in NSIR with full knowledge that: (a) she was attacked by NSIR security specialists in 2014, (b) she was diagnosed with PTSD as a result of the attack, (c) she had complained in February 2020 of undermining behavior by a supervisor in NSIR, and (d) she was not a subject matter expert (SME) on the matters assigned to the working group.

209. Ms. Franovich respectfully declined the nomination, expressing (a) concerns about her safety and security, (b) that she was not a SME on matters assigned to the WG, and (c) she already had a "full plate."

210. Despite her protestations Mr. Dudek insisted she participate, inflicting intentional distress and extreme anxiety.

211. Ms. Franovich informed Mr. Dudek that in July 2020 a manager in NSIR honored her request to instruct security specialists in NSIR to "cease and desist" contact with her after she received recurring messages that were disturbing and antagonistic, triggering PTS responses.

212. On January 26, 2021, Mr. Dudek finally relented, feigned ignorance of the attack and resulting PTS, and yet continued to antagonize Ms. Franovich by (a) requesting her to provide a current list of her duties and other collateral taskings and (b) threatening to increase her already substantial workload as lead Senior PM for the General Electric-Hitachi (GEH) small modular boiling water reactor (BWRX-300) review project.

213.    However, Ms. Franovich's anxiety persisted and increased as the week progressed. Thereafter, the Agency further harried Ms. Franovich to provoke and trigger PTS responses.

214.    Mr. Dudek and Ms. Bradford assigned non-urgent tasks with near-term due dates during periods of pre-approved EEO activity for Ms. Franovich to complete the urgent EEO investigative affidavit for NRR-20-22.

215.    Mr. Dudek made repeated attempts to frustrate and obstruct Ms. Franovich's protected EEO activity and grasped for pretext to further retaliate against her. After 2:00 pm on January 25, 2021, Mr. Dudek sent a request for information knowing he had approved official time for the remainder of the workday to work on the EEO investigative affidavit. Moreover, he expected Ms. Franovich to respond by close of business that day.

216.    Although Ms. Franovich was immediately, fully, and efficiently responsive to the request for non-urgent information, Mr. Dudek criticized her response as unsatisfactory.

217.    On January 26, 2021, Ms. Franovich responded that the information he requested was all there. Mr. Dudek responded that he asked for bulleted achievements and she did not provide him with *bullets*.

218.    Late on January 27, 2021, Ms. Bradford requested the status of topical report reviews by close of business the following day on January 28, 2021. Ms. Bradford offered no explanation for why she so urgently needed the information, and in fact she knew or should have known that two of the reviews were completed, and one had barely begun.

219.    Since Mr. Dudek's had approved official time for Ms. Franovich to work on the EEO investigative affidavit, he could have asked one of the other GEH BWRX-300 project managers (Jim Shea or Greg Cranston) to respond to the request. Instead, he demanded that Ms. Franovich respond and then added additional taskings.

220.    On January 28, 2021, Mr. Dudek overblew the significance of an inadvertent transmission of an unencrypted work product (among many emails Ms. Franovich sent to her personal email address as exhibits for her time-critical EEO investigative affidavit).

221.    Mr. Dudek's over-reaction to the transmission of Ms. Franovich's own work product to only herself further distracted Ms. Franovich from her EEO investigative affidavit and the conspicuously emergent, late request from Ms. Bradford the day before.

222.    On January 29, 2021, Mr. Dudek assigned arbitrary taskings to Ms. Franovich after he had pre-approved 7.5 hours of official time for her to work on the EEO investigative affidavit, knowing she would not be available to receive, much less complete, the taskings. Mr. Dudek could have given the taskings to Mr. Shea or Mr. Cranston, or he could have been responsive to the taskings himself. Yet he chose to assign them to Ms. Franovich and Mr. Tesfaye (GT), knowing Ms. Franovich was unavailable to complete them.

223.    Lastly, on January 29, 2021, Mr. Dudek asserted he had recently received "feedback" from an unnamed technical reviewer in Ms. Bradford's chain of command.

224.    In an email copied to Mr. Caldwell and Ms. Bradford, Mr. Dudek wrote that Ms. Franovich had allegedly not fostered NRC values during interactions and that she "hung up the phone on them" during her recovery of Mr. Wunder's deliberate release of proprietary and technically inaccurate information to the public on December 17, 2020.

225. The recovery effort involved resolution of numerous technical errors; redaction of proprietary information; and release of a technically sufficient, appropriately redacted document to the public.

226. The alleged "feedback" came as a complete surprise weeks after the alleged interactions took place and was patently false.

227. Nevertheless, the false accusation was alarming. Ms. Bradford's proposed suspension was similarly based on (a) Mr. Dudek's false accusation that Ms. Franovich hung up on him on July 17, 2020; (b) Mr. Dudek's false account of a branch meeting on July 21, 2017; (c) a trumped-up "management inquiry" into his false account; and (d) Ms. Bradford's and Ms. Weed's falsified or inaccurate summaries of statements by Ms. Franovich's co-workers.

228. With the Agency's decision to suspend Ms. Franovich for 15 days still before the Deciding Official, Dr. Marela Gavrilas, Director of NSIR, this latest accusation was an unveiled threat to Ms. Franovich's livelihood, retirement benefits and financial security.

229. Ms. Franovich's chain of command at numerous levels all the way up to Ms. Doane, the EDO, had opportunities to establish interim measures in accordance with the NRC's Anti-harassment Policy, and thereby protect Ms. Franovich from further harm and shield the Agency from further liability.

230. Ms. Franovich's requests for assistance from SBCR (Ms. Ordaz and Ms. Neubauer) and OGC (Ms. Schneiderman) produced no improvement in Mr. Dudek's hostility and obstruction. To the contrary, Mr. Dudek amplified his hostility, antagonism, threats, intimidation, badgering, and interference with Ms. Franovich's time-critical, protected EEO activity, for which he had pre-approved her use of official time.

43

231.    Dr. Gavrilas had an opportunity to alleviate the hostile environment as the Deciding Official named in the October 28, 2020, proposed 15-day suspension. Ms. Franovich's November 13, 2020, response to Dr. Gavrilas included evidence that the "management inquiry" was a retaliatory sham, and the proposed suspension was founded upon falsified and inaccurate summaries of interviews manufactured by Ms. Bradford and Ms. Weed.

232.    Dr. Gavrilas had months to consider the evidence, withdraw the proposed suspension, and propose interim measures be established in accordance with the NRC's Anti-harassment Policy. Yet she did not.

233.    Time and time again senior management officials failed to act in accordance with the NRC's Anti-harassment Policy, which mandates timely corrective action of a hostile environment before it becomes unlawful. Specifically, the Policy states "A hostile environment that violates EEO law usually requires a showing of a pattern of offensive conduct. Under this Policy, however, the NRC will not wait, nor should the employee wait, for such a pattern to emerge. The NRC will, where possible, act to stop and correct harassing conduct before it becomes unlawful; that is, before it becomes so pervasive or severe as to create an unlawful hostile work environment."

234.    The Agency exhibited a pervasive, systematic failure at every turn and opportunity to take action in accordance with the NRC's Anti-harassment Policy, allowing the retaliation to continue and worsen even after a formal EEO complaint of gender discrimination and retaliation was initially filed on June 25, 2021, and amended numerous times thereafter. Hence, the Agency now contends with Ms. Franovich's complaint of gender discrimination and retaliation – violations of Civil Rights law the

NRC's Anti-harassment Policy that was established and designed to prevent EEO complaints.

235.   By January 29, 2021, Ms. Franovich had exhausted all avenues for resolving the gender discrimination and ongoing retaliation, to no avail. With a notice of proposed 15-day suspension pending, Ms. Franovich reasonably believed the Agency (through Mr. Dudek and others) was attempting to fabricate additional pretext for the proposed suspension and, likely, termination.

236.   Recalling the March 2018 retaliatory termination of Andrew McCabe, former Deputy Director of FBI, just hours before Mr. McCabe's announced retirement would have been effective, Ms. Franovich recognized the unveiled and immediate threat to her livelihood and financial security.

237.   With the proposed 15-day suspension pending, and to escape the unbearable stress caused by Mr. Dudek's resumed and amplified hostility, his obstruction of her EEO activity, and the unveiled threat to her retirement benefits and financial security, Ms. Franovich resigned from the NRC effective immediately on January 30, 2021, fully expecting to be instated to an NRC branch chief position in due time as ordered in EEOC Norken's August 12, 2020, liability decision.

238.   On February 1, 2021, Ms. Franovich informed Lindsey Redden, OCHCO, that she resigned to seek a better work environment.

239.   In her February 5, 2021, EEO Investigative Affidavit for NRC 20-22, Ms. Franovich informed EEO Investigator Nadine Jenkins that she resigned on January 30, 2021, to escape the intolerable hostility and Mr. Dudek's obstruction of her protected EEO activity (subject of EEOC 570-2021-01222X).

240.    On May 11, 2021, Meredith Neubauer, Senior Civil Rights Specialist. SBCR, contacted Ms. Franovich's attorney:

Good Morning –

I am reviewing the draft Report of Investigation for Ms. Franovich's complaint, NRC-22-20.  I noticed that in her affidavit, Ms. Franovich states, "I left the NRC on January 30, 2021, to escape the hostile work environment and obstruction of my participation in the EEO process."

Based upon the response in the affidavit, I am seeking input as to whether you would like to amend your complaint to include an allegation of constructive discharge.  As that matter would fall under the jurisdiction of both the EEOC and the MSPB, SBCR would process the allegation as a mixed case complaint, with no provision for an EEOC hearing (but an appeal to the MSPB after agency written decision).

Please let me know what you decide as soon as you can.  If you wish to proceed, the clock is already moving.

241.    The EEO investigator first made contact with Ms. Franovich on May 17, 2021.

242.    Ms. Franovich, through counsel, requested an extension to complete EEO counseling.

243.    On August 11, 2021, the EEO counselor transmitted an August 10, 2021, Notice of Right to File a formal complaint of constructive discharge as Case Agency Number NRC 12-21.

244.    On August 19, 2021, and through counsel, Ms. Franovich filed her formal complaint of constructive discharge.

245.    On August 31, 2021, Mr. Smith, SBCR, acknowledged the Agency's receipt and acceptance of Ms. Franovich's timely-filed formal complaint for review.

246.    On September 22, 2021, Jeanne Dempsey, SBCR, informed Ms. Franovich that the NRC had partially accepted her complaint for investigation as a mixed case

complaint. The NRC accepted her complaint of constructive discharge and dismissed her complaint of persistent retaliation through a retaliatory investigation by NRC's OIG.

247. Defendant NRC informed Ms. Franovich that if she disagreed with the dismissal of any claims she could address the dismissal on appeal.

248. On October 6, 2021, Ms. Franovich received an EEO investigative affidavit. She completed and executed the affidavit on October 21, 2021.

249. On December 12, 2021, the Agency issued a notice of incomplete investigation to Ms. Franovich.

250. On February 12, 2022, the Agency issued the investigative file for NRC-12-21.

251. On March 31, 2022, the NRC issued its final agency decision (FAD) finding that Ms. Franovich "was not constructively discharged based on sex or reprisal for prior EEO activity" and there not entitled to the reliefs she had requested.

252. The ROI for EEOC Case No. 570-2021-01222X, NRC-22-20, reveals that numerous NRC officials violated the NRC's Anti-harassment Policy by working together to create and escalate the hostile environment that caused Ms. Franovich to resign on January 30, 2021. Ms. Bradford; Mr. Caldwell; Yvonne Weed, OCHCO Labor Relations Specialist; Stephen Smith, Civil Rights Program Manager, SBCR; and NRC attorneys Garrett Henderson, Ms. Schneiderman, Mark Maxin, and Marvin Itzkowitz, directed, instructed or guided Mr. Dudek in creating an untenable hostile environment. Ms. Weed, Mr. Smith, Mr. Henderson, Ms. Schneiderman, Mr. Maxin, and Mr. Itzkowitz similarly participated in Ms. Bradford's proposal to suspend.

253. Of note, Mr. Henderson and Ms, Schneiderman are lead attorneys defending the Agency against Ms. Franovich's 2016 EEO complaints. Ms. Franovich

47

contends Mr. Maxin and Mr. Itzkowicz likely advised NRC attorneys in their defense of the Agency while also directing, instructing and guiding Mr. Dudek, Ms. Weed, Mr. Caldwell, Ms. Bradford, Mr. Dorman and Ms. Doane in creating, sustaining and escalating an untenable hostile environment for Ms. Franovich.

254.    Ms. Franovich would have acquired 30 years of Federal service with the NRC on May 12, 2021, and she would have reached a minimum retirement age (MRA) of 56 years and four months on September 7, 2022.

255.    Her decision to resign under hostile work conditions and threat of termination (which would dispossess her of all retirement benefits after almost 30 years of dedicated and accomplished Federal service) was very difficult and distressing, but necessary to preserve her retirement benefits and the financial security these benefits will provide when she is retired.

256.    When she resigned, Ms. Franovich fully expected to be instated to a branch chief position in due time as ordered in EEOC Judge Norken's August 12, 2020, liability decision

257.    Ms. Franovich contends that the NRC officials (a) issued the proposed 15-day suspension two months after EEOC Judge Norken ordered NRC to instate her to a branch chief position; (b) purposefully delayed a decision by Dr. Gavrilas for over ten weeks after Ms. Franovich responded on November 13, 2020; (c) used the protracted pendency of Dr. Gavrilas' decision to establish an ongoing pretense for progressive disciplinary action; and (d) manufactured another accusation of the same nature (unprofessional conduct) as pretext to terminate her.

258.   By manufacturing pretext to terminate Ms. Franovich, NRC sought to (a) evade EEOC Judge Norken's order to instate her to an NRC branch chief position and (b) render worthless other ordered remedies (e.g., restoration of 253 hours of sick leave).

259.   On January 30, 2021, Ms. Franovich resigned, effectively pre-empting the NRC's plot to terminate and financially ruin her.

260.   Ms. Franovich's pre-emptive resignation so enraged NRC's leadership that the Agency again weaponized OIG to conduct another retaliatory investigation of her.

## COUNT I: RETALIATION IN VIOLATION TO TITLE VII

261.   Plaintiff Franovich incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-260 of this Complaint with the same force and vigor as if set out here in full.

262.   Ms. Franovich engaged in protected conduct under Title VII when she (a) complained of gender bias to her supervisors; (b) submitted and amended her EEO complaints; (c) opposed discrimination; (d) sought official time to work on her EEO complaints; and (e) participated in the EEO administrative process for prior EEO complaints of gender discrimination and retaliation she filed on April 7, 2016, and December 7, 2016.

263.   Because of Ms. Franovich's protected activity, Defendant NRC, among other things:

    a.   issued multiple counseling memoranda or emails;

    b.   launched, or attempted to launch, multiple baseless investigations of her EEO complaints or alleged misconduct, including (1) the "management inquiry" related to Mr. Dudek's physical aggression on July 17, 2020, and

the July 21, 2020, NRLB meeting; and (2) an investigation triggered by the Agency and its OIG and conducted after Ms. Franovich resigned;

c. proposed a 15-day suspension;

d. downgraded her performance evaluation;

e. interfered with Ms. Franovich's ability to participate in the EEO process;

f. unduly criticized Ms. Franovich's work products and performance;

g. charged Ms. Franovich AWOL after it approved her use of official time to engage in protected EEO activity; and

h. engaged in a course of hostility, antagonism, threats, intimidation, false or misleading accusations of misconduct, and badgering conduct towards Ms. Franovich.

264. Each of the above actions are materially adverse actions under the law, whether considered individually or together, and could well dissuade a reasonable person from engaging in protected activity.

265. Defendant NRC's acts further constitute a hostile work environment based on retaliation for protected activity in violation of Title VII of the Civil Rights Act of 1964.

266. As a direct and proximate result of the unlawful acts of Defendant NRC, Plaintiff Franovich suffered and continues to suffer pain, suffering, humiliation, damage to her character and reputation, and mental distress.

## COUNT II: DISCRIMINATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964

267. Plaintiff Franovich incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-260 of this Complaint with the same force and vigor as if set out here in full.

268. Because of Ms. Franovich's sex (female) Defendant NRC, among other things:

    a. issued multiple counseling memoranda or emails;

    b. launched, or attempted to launch, multiple baseless investigations of her EEO complaints or alleged misconduct including (1) the "management inquiry" related to Mr. Dudek's physical aggression on July 17, 2020, and the July 21, 2020, NRLB meeting; and (2) an investigation triggered by the Agency and its OIG and conducted after Ms. Franovich resigned;

    c. proposed a 15-day suspension;

    d. downgraded her performance evaluation;

    e. interfered with Ms. Franovich's ability to participate in the EEO process;

    f. unduly criticized Ms. Franovich's work product and performance;

    g. charged Ms. Franovich AWOL after it approved her use of official time to engage in protected EEO activity; and

    h. engaged in a course of hostility, antagonism, threats, intimidation, false or misleading accusations of misconduct, and badgering conduct towards Ms. Franovich.

269. Each of the above actions are materially adverse actions under the law, whether considered individually or together.

270. Defendant NRC's acts further constitute a hostile work environment based on sex in violation of Title VII of the Civil Rights Act of 1964.

271. As a direct and proximate result of the unlawful acts of Defendant NRC, Plaintiff Franovich suffered and continues to suffer pain, suffering, humiliation, damage to her character and reputation, and mental distress.

### COUNT III:  CONSTRUCTIVE DISCHARGE

271.   Plaintiff Franovich incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-266 of this Complaint with the same force and vigor as if set out here in full.

272.   Ms. Franovich faced non-stop hostility from her managers and appealed to multiple senior Agency officials on numerous occasions for relief, to no avail. The Agency took no steps to prevent or correct the harassment and, instead, enabled Ms. Franovich's managers to escalate the hostility, obstruct her EEO activity, and manufacture additional pretext to possibly terminate Ms. Franovich.

273.   Especially in light of the proposed suspension and continued false accusations of misconduct, Ms. Franovich reasonably believed her continued employment with the Defendant was impossible.

274.   To escape the unbearable stress caused by the escalating hostile environment, and what she perceived as a threat to her financial security in retirement, Ms. Franovich was compelled to resign.

275.   Accordingly, Ms. Franovich was constructively discharged by Defendant NRC.

276.   As a direct and proximate result of the unlawful acts of Defendant NRC, Plaintiff Franovich suffered and continues to suffer pain, suffering, humiliation, damage to her character and reputation, mental distress, lost salary and benefits, and lost interest.

### COUNT IV:  RETALIATORY INVESTIGATION

277.   Plaintiff Franovich incorporates by reference and re-alleges each of the allegations contained in paragraphs 1-276 of this Complaint with the same force and vigor as if set out here in full.

278.   After she resigned, the Agency persisted in its insatiable retaliation against Ms. Franovich, again weaponizing its OIG to fabricate pretext for yet another retaliatory investigation of her.

*          *          *

WHEREFORE, the premises considered, Plaintiff respectfully prays that this Honorable Court:

1.   Enter judgment on her behalf against Defendant;

2.   Award Plaintiff Franovich compensatory damages, and other damages;

3.   Reinstate Ms. Franovich as a Branch Chief with full seniority consistent with the August 12, 2020, order of EEOC Judge Norken, or, in lieu of reinstatement, award Ms. Franovich front pay, including benefits and sufficient time in service to retire with full benefits;

4.   Award Plaintiff Franovich back pay, including benefits;

5.   Award Plaintiff her court costs, expenses, attorneys' fees, prejudgment interest and post-judgment interest;

6.   Declare that Defendant's conduct is in violation of Title VII of the Civil Rights Act of 1964 and the Energy Reorganization Act of 1974; and

7.   Grant such other relief as this Court deems just and proper.

Respectfully submitted,

_____
Geoffrey H. Simpson #18868
WEBSTER & FREDRICKSON, PLLC
1101 Connecticut Ave, Suite 402
Washington, D.C.  20036
(202) 659-8510

Attorney for Plaintiff

JURY TRIAL DEMANDED


_____
Geoffrey H. Simpson #18868
WEBSTER & FREDRICKSON, PLLC
1101 Connecticut Ave, Suite 402
Washington, D.C.  20036
(202) 659-8510

Attorney for Plaintiff

54