IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RANI FRANOVICH                        :

                                      :

    v.                                :   Civil Action No. DKC 22-1008

                                      :

CHRISTOPHER T. HANSON, Chairman,
United States Nuclear Regulatory:
Commission

                                      :

**MEMORANDUM OPINION**

Plaintiff Rani Franovich has brought this employment discrimination action against Christopher T. Hanson, in his official capacity as the Chairman of the United States Nuclear Regulatory Commission (the "NRC" or the "Agency"), for claims of sex discrimination, retaliation, and constructive discharge, in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"). (ECF No. 8). Presently pending and ready for resolution is the motion to dismiss or, in the alternative, for summary judgment filed by Defendant. (ECF No. 12). No hearing is necessary. *See* Local Rule 105.6. For the following reasons, Defendant's Motion will be granted in part and denied in part.

## I. Background

The following facts are alleged in Plaintiff's Amended Complaint. (ECF No. 8). Plaintiff was hired to work for the NRC

in 1991 as a Grade 9 engineer.  (*Id.* ¶ 20).  In 2005, she was promoted to a management position in the Office of Nuclear Reactor Regulation ("NRR") and continued working at that level for several years.  (*Id.* ¶ 20).  The Amended Complaint contains many allegations of discrimination that occurred between 2005 and 2019, but those allegations are not the subject of her claims now before the court.  Plaintiff filed a series of complaints of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") between 2016 and 2019.  (*Id.* ¶¶ 4, 49, 54, 62).  The EEOC was in the process of evaluating these complaints at the time of some of the events that are the subject of Plaintiff's claims now before the court.

In January of 2020, Joseph Anderson, a male NRC Chief in the Office of Nuclear Security and Incident Response ("NSIR"), sent Plaintiff an email that implied that she had failed to apprise him of a discussion that was scheduled to take place and attempted to exclude another employee from the discussion.  (*Id.* ¶¶ 64-66). Mr. Anderson altered prior email correspondence between himself and Plaintiff in which Plaintiff had advised him that the discussion had been cancelled, which Plaintiff perceived as an "attempt to undermine [her] in front of senior management."  (*Id.* ¶ 65).  Plaintiff reminded Mr. Anderson of their prior correspondence, but Mr. Anderson did not acknowledge or apologize for the email, which was distributed to multiple senior executives.

2

(*Id.* ¶ 67).   Plaintiff's supervisors at or around this time were Michael Dudek, who was a branch chief; Robert Caldwell, Plaintiff's second-level supervisor; Anna Bradford, Plaintiff's third-level supervisor; and Robert Taylor, Plaintiff's fourth-level supervisor.  (*Id.* ¶¶ 65, 109).   Plaintiff asked Mr. Dudek, Mr. Caldwell, and Ms. Bradford to take action or seek accountability from Mr. Anderson, but her supervisors declined to do so.  (*Id.* ¶¶ 68-69).

On March 10, 2020, Mr. Dudek approached Plaintiff in her open cubicle to discuss an email she had sent to other senior employees, including Dante Johnson, an NSIR branch chief, about a document request from another NRC employee.  (*Id.* ¶¶ 70, 72).   Mr. Dudek told Plaintiff that her email was "not nice" and "too negative." (*Id.* ¶ 72).   Plaintiff responded to Mr. Dudek that she believed his perception of her email to be influenced by gender stereotypes of women being "nurturing, accommodating[,] and nice rather than directing and authoritative, traits generally associated with strong, male leaders."  (*Id.* ¶ 73).   This discussion occurred within earshot of other employees, although there were private spaces where the conversation could have occurred instead.  (*Id.* ¶ 72).

Two days later, Plaintiff sent an email to Ms. Bradford in which she included "her candid assessment of NSIR's organizational challenges and failure to be responsive to the [document] request."

(*Id.* ¶¶ 81-82).    Mr. Dudek replied to this email, saying, "[P]hrases used in your email below that describe NSIR as bungling, blew it, exasperated, dysfunctional, and feckless do not ascribe to the NRC's . . . organizational values.  This feedback is akin to my feedback given to you . . . regarding your email to Dante Johnson of NSIR."  (*Id.* ¶ 84).  Mr. Dudek copied other NRC management officials on the email.  (*Id.* ¶ 85).

Two weeks later, Mr. Dudek issued a counseling memorandum to Plaintiff, which included their discussions of sex discrimination as a supporting basis for the memorandum.  (*Id.* ¶¶ 91-92).  The memorandum stated that Plaintiff did not follow guidance in communications via email, engaged in verbal and written communication not in accordance with NRC values, engaged in hostile and disrespectful communications to supervisory staff, and displayed unprofessional behavior in the emails and during the March 10 discussion.  (*Id.* ¶ 93).

In April 2020, Mr. Dudek sent Plaintiff an email, accusing her of leaking sensitive information by sending Agency documents to her personal email.  (*Id.* ¶ 95).  Plaintiff's other supervisors were copied on the email.  (*Id.*).  Mr. Dudek later acknowledged that no leak had occurred but prohibited Plaintiff from forwarding work emails to her personal email account in the future.  (*Id.* ¶¶ 97-100).  This prohibition interfered with Plaintiff's ability to prepare exhibits for her complaints pending before the EEOC.  (*Id.*

4

¶¶ 98, 103).   Plaintiff told her supervisors about this issue on April 22, 2020.   (*Id.* ¶ 105).   The NRC lifted Mr. Dudek's prohibition on April 28, 2020.   (*Id.* ¶ 106).

On April 13, 2020, Plaintiff submitted an informal complaint of sex discrimination and retaliation to the Agency's Office of Small Business and Civil Rights ("SBCR").   (Id. ¶ 104).   On June 25, 2020, Plaintiff filed a formal complaint of sex discrimination and retaliation with the EEOC.   (*Id.* ¶ 110).   On July 17, 2020, during a video conference with Plaintiff, Mr. Dudek "pounded his fists on a desk" and insisted that Plaintiff violated Agency policy or failed to meet management expectations regarding an assignment. (*Id.* ¶¶ 113, 121).   A branch meeting was held on July 21, 2020, at which Mr. Dudek again addressed his concerns about Plaintiff's compliance with Agency policy.   (*Id.* ¶ 121).   Plaintiff "offered [her] views and opposed his baseless accusations and hostility" during the meeting.   (*Id.*).   Later that day, Plaintiff emailed Daniel Dorman, then the NRC's Deputy Executive Director for Reactor and Preparedness Programs, with a copy to his supervisor, Margaret Doane.   (*Id.* ¶ 115).   She requested "intervention and relief from an untenable work environment" and stated that her supervisors knew about the sex discrimination and retaliation and failed to correct it.   (*Id.* ¶¶ 115-16).

The next day, Plaintiff received an email from Yvonne Weed, a labor relations specialist, who informed Plaintiff that she and

Ms. Bradford had launched a "management inquiry" into a "conflict" that occurred at the branch meeting on July 21, 2020. (*Id.* ¶¶ 117, 120). Ms. Bradford interviewed Plaintiff on July 30, 2020. (*Id.* ¶ 122). Plaintiff's account of the events leading up to the inquiry were not included in the report written by Ms. Bradford and Ms. Weed. (*Id.*). Also on July 30, 2020, Mr. Dorman declined to meet with Plaintiff, citing the management inquiry as the reason for declining. (*Id.* ¶ 123).

On August 12, 2020, the EEOC issued a decision on one of Plaintiff's prior EEOC complaints that involved a failure-to-promote claim. (*Id.* ¶¶ 124-25). The EEOC found that Plaintiff had been subjected to sex discrimination and ordered the NRC to promote her to a branch chief position comparable to the one for which she was not selected. (*Id.* ¶ 125, 127). Plaintiff requested approval from Mr. Dudek of seventy hours of official time to respond to requests from the EEOC related to that decision and prepare for and attend a damages hearing. (*Id.* ¶ 128). Mr. Dudek only approved twenty-four hours of the seventy hours Plaintiff requested. (*Id.*).

On August 31, 2020, Plaintiff amended her June 25, 2020, EEOC complaint to include the "July 17, 2020, escalation of the retaliation to (a) baseless pretext for criticism of [Plaintiff's] work performance and (b) physical hostility by Mr. Dudek when [Plaintiff] defended herself against his fabricated criticisms."

(*Id.* ¶ 130).   She added that Mr. Dudek's supervisors had "long been apprised of a discriminatory, hostile work environment and ha[ve] been ineffectual in correcting it."   (*Id.* ¶ 131).

Also on August 31, 2020, Plaintiff requested six hours of official time to meet with her representative on September 3, 2020, to review a fee petition for her EEOC matter.   (*Id.* ¶¶ 132-133). Mr. Dudek approved the request.   (*Id.* ¶ 132).   The meeting ultimately lasted seven hours, and Plaintiff entered seven hours in the time reporting system.   (*Id.* ¶ 133).   On September 11, 2020, Mr. Dudek asked her to revise her time entry to be six hours, and Plaintiff responded that seven hours represented the actual amount of time spent.   (*Id.* ¶ 134).   Mr. Dudek charged Plaintiff as "Absent Without Leave", or "AWOL," for the missing hour.   (*Id.* ¶ 138).   Plaintiff appealed to Ms. Doane for intervention, but Ms. Doane took no action.   (*Id.* ¶¶ 136, 140-41).   On September 17, Mr. Dudek rescinded the AWOL charge.   (*Id.* ¶ 143).

On September 14, 2020, Ms. Doane informed Plaintiff that she had asked Mr. Dorman and Ms. Bradford to review Plaintiff's complaints about Ms. Bradford's participation in the Agency's retaliation.   (*Id.* ¶ 137).   On September 22, 2020, Ms. Bradford responded, informing Plaintiff that Mr. Dudek would remain the branch chief pending the review, despite a provision in the NRC's Anti-Harassment Policy requiring that interim relief measures be

put in place during a review of a complaint of harassment. (*Id.* ¶ 145).

On September 24, 2020, Plaintiff amended her complaint again to include Mr. Dudek's approval of only twenty-four hours for her to attend to EEOC matters and the incident involving the AWOL charge. (*Id.* ¶¶ 147-48). Later that same day, Mr. Dudek issued Plaintiff a formal memorandum regarding her time accounting. (*Id.* ¶ 153).

On October 19, 2020, Mr. Dudek issued Plaintiff's performance rating for fiscal year 2020. The rating was "Fully Successful"— the lowest performance rating she had received since she was first hired at the NRC. (*Id.* ¶ 154). On October 27, 2020, he explained that he issued her that rating because of her frequent disagreements with him—including incidents raised in her pending EEOC complaints—and her complaints to senior officials. (*Id.* ¶ 156).

On October 28, 2020, Ms. Bradford informed Plaintiff that she had completed a review of Plaintiff's complaint that Mr. Dudek engaged in physical hostility on July 17, 2020, and she believed Mr. Dudek's account that he was nervously tapping his fingers rather than pounding his fists. (*Id.* ¶ 157). Ms. Bradford also proposed suspending Plaintiff for fifteen days for unprofessional conduct during the July 21, 2020, branch meeting. (*Id.*). Plaintiff opposed the proposed suspension, and it was put before

8

an NRC official for review.  (*Id.* ¶ 161).  A decision on the proposed suspension was never issued.  (*Id.* ¶ 234-35, 240).

On November 2, 2020, Plaintiff filed her third amendment to her June 25, 2020, EEOC complaint to include Mr. Dudek's September 24, 2020, memorandum.  (*Id.* ¶ 160).  On November 25, 2020, she filed a fourth amendment to include Mr. Dudek's performance appraisal and Ms. Bradford's proposed suspension.  (*Id.* ¶ 162).

On December 10, 2020, a specialist at SBCR contacted Plaintiff to ask if she was interested in participating in alternative dispute resolution for her June 25, 2020, complaint.  (*Id.* ¶ 166).  Plaintiff confirmed her interest and noted that as a preliminary matter, interim measures had not been taken, as required by the NRC's Anti-Harassment Policy.  (*Id.* ¶ 167).  She also noted that she had not yet been promoted to a branch chief position, as was ordered by the EEOC. (*Id.*).  A mediation was scheduled for December 21, 2020, and Plaintiff requested official time to prepare for and attend it.  (*Id.* ¶ 168).  Mr. Dudek demanded that she complete a new approval form.  (*Id.*).  Plaintiff appealed to Vonna Ordaz, Director of the Office of Small Business and Civil Rights, for assistance.  (*Id.* ¶¶ 169-70).  On December 17, 2020, Plaintiff and Ms. Ordaz spoke about Plaintiff's concerns with Mr. Dudek's "arbitrary impediments to frustrate [her] engagement in the EEO process" and "practice of constantly fabricating new rules," and they discussed appointing Plaintiff to a branch chief position

outside of Ms. Bradford's organization as a potential interim measure. (*Id.* ¶ 169-71).

On December 21, 2020, an EEOC investigator sent Plaintiff a 185-question investigative affidavit to complete. (*Id.* ¶ 173). On January 11, 2021, Plaintiff requested ten hours of official time for that week and the following pay period to complete the affidavit. (*Id.* ¶ 178). Mr. Dudek only approved time for January 13 and 14. (*Id.* ¶ 179). On January 13, Mr. Dudek insisted that Plaintiff attend an all-day meeting, despite her pre-approved plan to prepare responses to her EEOC affidavit. (*Id.* ¶ 181). Mr. Dudek and Plaintiff reached an agreement where her workday would be seven hours on January 14 and would be used to complete her EEOC affidavit. (*Id.* ¶ 185). Despite this, Mr. Dudek requested that she attend newly scheduled meetings that day. (*Id.* ¶ 186). Plaintiff did not receive those requests because she was away from her NRC computer working on the affidavit. (*Id.* ¶ 187). On January 21, 2021, Mr. Dudek emailed Plaintiff, copying Mr. Caldwell and Ms. Bradford, to accuse her of being inaccessible and non-compliant with the Agency's time policy. (*Id.* ¶¶ 194-197). Plaintiff responded to Mr. Dudek's email, with copy to Mr. Caldwell and Ms. Bradford, and expressed among other things that she felt Mr. Dudek was continuing to "impede [her] ability to participate in the EEO process." (*Id.* ¶ 200).

10

On January 25, 2021, Mr. Dudek attempted to force Plaintiff to "participate in a working group with security specialists in NSIR," despite knowing that "she was attacked by NSIR security specialists in 2014," "she was diagnosed with PTSD as a result of the attack," "she had complained in February 2020 of undermining behavior by a supervisor in NSIR," and "she was not a subject matter expert . . . on the matters assigned to the working group." (*Id.* ¶ 211).   Despite her declining the nomination, Mr. Dudek persisted until he finally relented a day later.  (*Id.* ¶ 213-15). Mr. Dudek then requested a list of her duties and threatened to increase her workload.  (*Id.* ¶ 215).   Mr. Dudek and Ms. Bradford also continued to interrupt her ability to work on the EEOC matters by assigning her non-urgent tasks and instituting deadlines that interfered with her pre-approved EEOC time.  (*Id.* ¶¶ 217-225).

On January 29, 2021, Mr. Dudek informed Plaintiff in an email, with copy to Mr. Caldwell and Ms. Bradford, that he had received feedback from an unnamed technical reviewer who stated that Plaintiff had not "fostered NRC values" and had hung up the phone during a conversation in December 2020.  (*Id.* ¶ 226-27).   Plaintiff found this report to be a complete surprise and believed it was "patently false."  (*Id.* ¶ 229).

Plaintiff resigned from the NRC on January 30, 2021, "to escape the intolerable hostility and Mr. Dudek's obstruction of her protected EEO activity."  (*Id.* ¶¶ 240, 242).   At that point,

she still expected to be appointed to an NRC branch chief position in due time, as ordered by the EEOC. (*Id.* ¶ 240). Plaintiff alleges that "[h]er decision to resign under hostile work conditions and threat of termination (which would dispossess her of all retirement benefits after almost 30 years of dedicated and accomplished Federal service) was . . . necessary to preserve her retirement benefits and the financial security these benefits will provide when she is retired." (*Id.* ¶ 258).

On August 19, 2021, Plaintiff filed a formal complaint for constructive discharge with the EEOC. (*Id.* ¶ 247). On September 22, 2021, Plaintiff was informed that the NRC was investigating her complaint of constructive discharge. (*Id.* ¶ 249). On March 31, 2022, the NRC issued its final agency decision ("FAD"), finding that she "was not constructively discharged based on sex or reprisal for EEO activity." (*Id.* ¶ 254).

Plaintiff filed the instant action on April 25, 2022, which was less than thirty days after receiving the FAD as to her constructive discharge complaint. (ECF No. 1). Plaintiff's June 25, 2020, complaint was still under review before the EEOC. (ECF No. 8 ¶ 14). On June 14, 2022, shortly after the June 25, 2020, complaint was assigned to an EEOC Administrative Law Judge, Plaintiff withdrew it on the grounds that it substantially overlapped with this district court action. (*Id.* ¶ 15). Plaintiff then filed her Amended Complaint on August 2, 2022, which was

within ninety days of her withdrawal.  (*Id.* ¶ 16).  On April 20, 2023, the Agency issued an FAD in the case from which Plaintiff had withdrawn, adopting the EEOC's order of dismissal.  (ECF No. 28-1).

## II. Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the facts alleged in the complaint, which must allege enough facts to state a plausible claim for relief. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Defendant styled his motion as a motion to dismiss or, in the alternative, for summary judgment. Typically, when deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court considers only the complaint and any documents attached to the motion that are "integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d

700, 705 (4th Cir. 2007). Rule 12(d) requires courts to treat such a motion as a motion for summary judgment where matters outside the pleadings are considered and not excluded. Fed.R.Civ.P. 12(d). Before converting a motion to dismiss to one for summary judgment, courts must give the nonmoving party "a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* This "reasonable opportunity" requirement has two components: (1) the nonmoving party must have some notice that the court is treating the Rule 12(b)(6) motion as a motion for summary judgment, and (2) the nonmoving party "must be afforded a reasonable opportunity for discovery" to obtain information essential to oppose the motion. *Gay v. Wall*, 761 F.2d 175, 177 (4th Cir. 1985) (internal quotation marks omitted).

The notice requirement can be satisfied when the moving party styles its motion to dismiss as a motion for summary judgment in the alternative and attaches supporting exhibits. *See Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998). To show that a reasonable opportunity for discovery has not been afforded, the nonmoving party must file an affidavit or declaration under Rule 56(d), or another filing, explaining why "for specified reasons, it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d); *see also Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

14

# III.  Analysis

Plaintiff asserts claims of Retaliation (Count I), Discrimination (Count II), Constructive Discharge (Count III), and Retaliatory Investigation (Count IV).  In his motion to dismiss, Defendant argues that (1) Plaintiff has failed to exhaust her administrative remedies as to Counts I, II, and IV; (2) Plaintiff has failed to allege facts sufficient to satisfy the elements of Counts I and II; (3) Plaintiff has failed sufficiently to allege a hostile work environment; (4) the *Faragher/Ellerth* defense bars all claims of hostility and harassment; and (5) Plaintiff has failed to plead plausible claims for Counts III and IV. Alternatively, Defendant argues he is entitled to summary judgment on all counts.  (ECF No. 12-1).

## A. Administrative Exhaustion

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . because of such individual's . . . sex" or "because [the individual] has opposed any practice made an unlawful employment practice" under Title VII.  42 U.S.C. §§ 2000e-2(a)(1)-(a)(2), 2000e-3(a).  The Equal Employment Opportunity Act, which amended Title VII, "delegates to the EEOC the authority to ensure that federal agencies comply with Title VII and allows aggrieved federal employees to commence civil actions in federal court for review of their discrimination

15

claims." *Pueschel v. United States*, 369 F.3d 345, 352–53 (4th Cir. 2004) (footnote omitted).

Federal employees must, however, "exhaust their administrative remedies prior to commencing such an action." *Id.* at 353; 42 U.S.C. § 2000e-16(c). Specifically, federal employees must first try to resolve the matter informally with a counselor, and if the issue is not resolved, they must then file a formal complaint with the agency. *See* 29 C.F.R. § 1614.105(a)-1614.108. Once the agency takes "final action," the employee may appeal the decision to the EEOC or file a private civil action. *Id.* § 1614.110. Title VII's exhaustion requirement is not jurisdictional but rather "a processing rule, albeit a mandatory one." *Fort Bend Cnty., Tex. v. Davis*, 139 S.Ct. 1843, 1850–51 (2019).

Defendant argues that Plaintiff has failed to exhaust her administrative remedies as to Counts I, II, and IV because those claims have not been subject to an FAD or an EEOC decision. As to Counts I and II, Plaintiff filed an informal complaint of retaliation and discrimination on April 13, 2020, and ultimately filed her formal complaint on June 25, 2020. (ECF No. 8 ¶¶ 104, 110). Although Plaintiff filed this action prior to the issuance of an FAD as to that complaint, that is because the filing of her

second formal complaint, for constructive discharge,[1] permitted her to do so. (*Id.* ¶ 247). Because Plaintiff's constructive discharge claim was based on the same facts and events giving rise to her retaliation and discrimination claims, the latter claims are "reasonably related" to her constructive discharge claim and permit her to "advance [them] in her subsequent civil suit." *Sydnor v. Fairfax County*, 681 F.3d 591, 594 (4th Cir. 2012) (quoting *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247 (4th Cir. 2000)). Plaintiff has thus exhausted her administrative remedies as to Counts I and II.

As for Count IV, a retaliation claim may be raised for the first time in federal court, particularly when the claimed retaliation is purported to be a response to the plaintiff's filing of an EEOC complaint in the first instance. *See Hentosh v. Old Dominion Univ.*, 767 F.3d 413, 416 (4th Cir. 2014). This rule also applies to retaliation that is "a continuation of the treatment alleged in the charge before the court." *Jones v. Calvert Grp.*, 551 F.3d 297, 304 (4th Cir. 2009). The unique treatment for retaliation claims is justified because a plaintiff who faced retaliation for filing an EEOC charge "would naturally be gun shy about inviting further retaliation by filing a second charge complaining about the first retaliation." *Hentosh*, 767 F.3d at

---

[1] Defendant does not dispute that Plaintiff exhausted her administrative remedies as to this claim.

417 (internal quotation marks omitted).  Accordingly, Plaintiff has also exhausted her administrative remedies as to Count IV.

### B. Discrimination Claim

To state a claim for sex discrimination under Title VII, a plaintiff must plausibly plead that her employer took an adverse action against her because of her sex. *See* 42 U.S.C. § 2000e-2(a).  At the motion to dismiss stage, a plaintiff is not required to plead a prima facie case of discrimination—she need only "allege facts to satisfy the elements of a cause of action created by that statute." *McCleary-Evans v. Maryland Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584-85 (4th Cir. 2015).  Thus, she must allege sufficient facts to make it plausible that (1) she suffered an adverse employment action, and (2) the action was because of her sex. *See id.; see also Felder v. MGM Nat'l Harbor, LLC*, No. 20-2373, 2022 WL 2871905, at *1 (4th Cir. July 21, 2022). Defendant argues that Plaintiff has not pleaded sufficient facts to satisfy either element.

### 1. Adverse Employment Action

The presence of an adverse employment action is "an absolute precondition" to an employment discrimination suit. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985).  "An adverse employment action is a discriminatory act which adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment." *James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371,

18

375 (4th Cir. 2004) (internal quotation marks omitted).  To qualify,
the action must "constitute[] a significant change in employment
status, such as hiring, firing, failing to promote, reassignment
with significantly different responsibilities, or a decision
causing a significant change in benefits." *Hoyle v. Freightliner,*
*LLC*, 650 F.3d 321, 337 (4th Cir. 2011) (internal quotation marks
omitted).

Plaintiff alleges multiple actions that she claims meet the
standard for "adversity" in connection with her sex discrimination
claim.  She alleges that Defendant:

> a. issued multiple counseling memoranda or
> emails;
> b. launched, or attempted to launch, multiple
> baseless investigations of her EEO complaints
> or alleged misconduct including (1) the
> "management inquiry" related to Mr. Dudek's
> physical aggression on July 17, 2020, and the
> July 21, 2020, NRLB meeting; and (2) an
> investigation triggered by the Agency and its
> OIG and conducted after Ms. Franovich
> resigned;
> c. proposed a 15-day suspension;
> d. downgraded her performance evaluation;
> e. interfered with Ms. Franovich's ability to
> participate in the EEO process;
> f. unduly criticized Ms. Franovich's work
> product and performance;
> g. charged Ms. Franovich AWOL after it
> approved her use of official time to engage in
> protected EEO activity; and
> h. engaged in a course of hostility,
> antagonism, threats, intimidation, false or
> misleading accusations of misconduct, and
> badgering conduct towards Ms. Franovich.

(ECF No. 8 ¶ 271).

None of these actions is sufficient to meet the adverse employment standard as required for a Title VII discrimination claim. Plaintiff has not alleged that her pay was decreased, she was demoted, her responsibilities were taken away, or any other action that has affected the terms, conditions, or benefits of her employment. Although courts have found conduct short of ultimate employment decisions to constitute adverse employment actions, "there still must be a tangible effect on the terms and conditions of employment." *Thorn v. Sebelius*, 766 F.Supp.2d 585, 598 (D.Md. 2011) (internal quotation marks omitted). While Plaintiff suggests that some of these actions could have affected her eligibility for promotion, she has also alleged that she was entitled to be promoted to a branch chief position, pursuant to the EEOC's August 2020 ruling. (ECF No. 8 ¶¶ 124-127). Plaintiff alleges that even upon her resignation, she still expected to be placed in such a position. (*Id.* ¶ 240). Accordingly, Plaintiff's Amended Complaint does not allege an adverse employment action sufficient to support her sex discrimination claim.

### 2. Causation

Even if Plaintiff had sufficiently alleged that she suffered an adverse employment action, the facts she pleaded about the circumstances of those employment actions cannot be construed to state a plausible claim that the actions were taken because of her sex. Plaintiff argues that causation may be inferred by Mr.

Dudek's use of "gender stereotypes" when criticizing her communication style.  (ECF No. 15, at 36).  The Amended Complaint only alleges, however, that Mr. Dudek used the words "not nice" and "too negative" when counseling Plaintiff about language she used in emails to other employees.  In certain contexts, those words may have a basis in gender stereotypes.  Without more, however, Plaintiff's assertion that "nice" and "negative" were based on gender stereotypes is too conclusory to suffice as circumstances that suggest a discriminatory motive.

Plaintiff also argues that causation may be inferred based on the allegations in the Amended Complaint that exemplify differential treatment between herself and a male manager, Mr. Anderson, under similar circumstances.  (ECF No. 15, at 25-27). She alleges that Mr. Anderson deliberately altered correspondence to undermine Plaintiff in front of senior management, and Mr. Dudek and other supervisors did nothing to correct Mr. Anderson's intentional misconduct.  (ECF No. 8 ¶¶ 64-69).  In contrast, when Mr. Dudek found Plaintiff's correspondence with another employee to be inappropriate, he harshly reprimanded Plaintiff and issued a counseling memorandum.  (*Id.* ¶¶ 70-93).

Plaintiff has failed to allege that Mr. Anderson is a sufficiently similar comparator.  She has not alleged that Mr. Anderson has the same or similar job duties, working environments or standards, or even if they report to the same supervisors.  *See*

*Booth v. Cnty. Exec.*, 186 F.Supp.3d 479, 486 (D.Md. 2016) (finding that the plaintiff failed to allege a sufficiently similar comparator where the complaint did not identify the comparator's race, job title, responsibilities, or supervisor).   In fact, Plaintiff has stated that Mr. Anderson worked in NSIR—a separate office that Mr. Dudek did not supervise at the time.   (ECF No. 8 ¶¶ 64-65).   Plaintiff's claim of disparate treatment cannot rise above speculation.   Thus, Plaintiff's sex discrimination claim will be dismissed.

### C. Retaliation Claim

To state a claim of retaliation, a plaintiff must allege that her employer took an adverse action against her because of her opposition of employment practices made unlawful by Title VII, also known as "protected activity."   42 U.S.C. § 2000e-3(a); *see also Holloway v. Maryland*, 32 F.4th 293, 299-300 (4ᵗʰ Cir. 2022). Defendant does not dispute that Plaintiff engaged in protected activity through her informal complaints of sex discrimination to her supervisors and formal complaints to the EEOC.   Defendant argues that Plaintiff has not sufficiently alleged an adverse employment action or a causal connection between the protected activity and the adverse action.

### 1. Adverse Employment Action

The standard for an adverse action is more inclusive for a retaliation claim than for a substantive discrimination claim.

*See Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). Specifically, "[r]etaliatory actions need not 'affect the terms and conditions of employment[.]'" *Id.* A plaintiff can satisfy this element by alleging an action "that a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Evans v. Int'l Paper Co.,* 936 F.3d 183, 195 (4th Cir. 2019). Plaintiff alleges the same adverse employment actions in support of her retaliation claim that she alleged for her discrimination claim, including the counseling memoranda, investigations, proposed suspension, downgraded performance evaluation, interference with work on EEOC matters, the AWOL charge, and frequent criticisms. (ECF No. 8, at 50-51).

Plaintiff has sufficiently pleaded an adverse employment action to support her retaliation claim in Count I. Specifically, Plaintiff alleges that after she expressed concerns of sex discrimination to Mr. Dudek, she received a counseling memorandum from Mr. Dudek that cited this conversation on gender bias as one of the reasons for the memorandum. Then, just two weeks after Plaintiff filed her formal complaint of discrimination and retaliation, Mr. Dudek "banged his fists" on a table and accused her of not following protocol, her supervisors launched a management inquiry into her actions and refused to include her

account of the events in their report, and senior management refused to meet with her to discuss her retaliation and discrimination claims about her supervisors. (ECF No. 8 ¶¶ 110-123). Additionally, Plaintiff's attempts to work on matters relating to her EEOC claims were limited by her supervisors' actions, including their authorization of less time than she requested to work on those matters and their assignment of non-time-sensitive work and scheduling of meetings during time she was approved to work on those matters. (*Id.* ¶¶ 173-200).

Plaintiff has alleged that she was subjected to heightened scrutiny, received unwarranted lower evaluations of her work product and performance, faced physical threats, was investigated for no legitimate reason, and was subjected to work protocols that were otherwise non-existent or only applied to her. These alleged adverse employment actions might well have dissuaded a reasonable worker from making a charge of discrimination in the first instance. Thus, Plaintiff's allegations are sufficient to meet the adverse employment action requirement for her retaliation claim.

### 2. Causal Connection

Plaintiff has also pleaded sufficient facts to support an inference of causation for her retaliation claim. "Temporal proximity between an employee's charge of discrimination and an adverse employment action can support an inference that the

24

employer acted 'because' of that charge." *Holloway*, 32 F.4th at 300.   Plaintiff confronted Mr. Dudek with gender bias allegations in March 2020, and a mere two weeks later, he issued her a counseling memorandum in which he cited the gender bias conversation.   Furthermore, on June 25, 2020, Plaintiff filed her formal complaint, and just a few weeks later, she was the subject of a management inquiry, harsh criticisms of her work, and a proposed suspension.   Because Plaintiff has alleged that Defendant took adverse actions against her shortly after becoming aware of her protected activities, Plaintiff has alleged sufficient facts to support an inference of a causal connection.

### D. Hostile Work Environment

Plaintiff also alleges that she was subjected to a hostile work environment as part of both her discrimination and retaliation claims.   In other words, she alleges that she was subjected to a hostile work environment because of her sex and in retaliation for her engagement in protected activity.   To state a hostile work environment claim under Title VII, a plaintiff must allege that "(1) she experienced unwelcome harassment; (2) the harassment was based on her gender, race, or age; (3) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere; and (4) there is some basis for imposing liability on the employer." *Bass v. E.I. DuPont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003).

### 1. The Four Elements of a Hostile Work Environment Claim

It is not difficult to plead sufficient facts in support of the first element—unwelcome conduct.   "[A]n employee can demonstrate that certain conduct is unwelcome simply by voicing her objection to the alleged harasser or to the employer." *Strothers*, 895 F.3d at 328-29.   "The alleged conduct need not be severe, as severity is better addressed under the third element, pervasiveness."   *Id.*   Plaintiff voiced to her supervisors her objection to sex discrimination and retaliation multiple times, both informally and through formal complaints.   The first element is met.

The second element requires that the offending conduct be based on the employee's sex.   As previously discussed, Plaintiff's allegations are insufficient to tie her discrimination claims to her sex, but she has alleged a sufficient causal connection for her retaliation claims.   Accordingly, her discrimination-based hostile work environment claim fails at the second element, but her retaliation-based hostile work environment claim survives.

The third element of a hostile environment claim requires that the offending conduct be sufficiently severe or pervasive. This element has both a subjective and objective component: "the employee must both personally and reasonably believe that the conduct rises to the level of a hostile environment."   *Id.*   "In assessing whether harassment is objectively abusive, courts must

examine the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

There is no doubt that Plaintiff personally believed that the conduct rose to the level of a hostile environment. Taking all her allegations as true, it is also objectively reasonable that she believed this. The alleged actions by Plaintiff's supervisors during the period leading up to her resignation were frequent, harsh, and potentially humiliating, including fabricated or exaggerated criticisms in group settings and in front of senior officials, physical displays of hostility, and repeated threatened disciplinary actions. The fact that the treatment Plaintiff complained of came from her supervisors increases its severity. *See Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 278 (4th Cir. 2015) ("[A] supervisor's power and authority invests his or her harassing conduct with a particular threatening character."). The net effect of the events described in the Amended Complaint would reasonably detract from an employee's ability to perform her job. Thus, the Amended Complaint contains sufficiently severe allegations to support Plaintiff's retaliatory hostile work environment claim.

The final element of a hostile work environment claim is that it must be imputable to the employer.  "If the harasser is a supervisor, then the employer may be either strictly or vicariously liable for the supervisor's actions." *Id.* at 333.  Defendant does not dispute that the conduct Plaintiff complains of is attributable to the NRC.  Accordingly, Plaintiff has sufficiently pleaded a claim for retaliatory hostile work environment.

### 2. *Faragher/Ellerth* Defense

Defendant argues, however, that even if Plaintiff has sufficiently pleaded a hostile work environment claim, the *Faragher/Ellerth* defense bars it.  Courts have held that, "where the harasser is the victim's supervisor" the employer "may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.'" *Boyer-Liberto*, 786 F.3d at 278 (internal quotation marks omitted).  Referred to as the *Faragher/Ellerth* defense because of the Supreme Court cases that established it,[2] this principle essentially "imposes a duty on the victim to report her supervisor's harassing behavior to the employer." *Id.*

---

[2] *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 763 (1998).

Defendant contends that the Amended Complaint reflects that it had in place an anti-harassment policy, which is sufficient to show reasonable care, and that Plaintiff failed to avail herself of it.[3]  Indeed, "[a]n employer's adoption of an effective anti-harassment policy is an important factor in determining whether it exercised reasonable care" to prevent discrimination or retaliation.  *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 244 (4th Cir. 2000).  Nonetheless, "any policy adopted by the employer must be both reasonably designed and reasonably effectual."  *Brown v. Perry*, 184 F.3d 388, 396 (4th Cir. 1999).  The allegations in the Amended Complaint, taken as true, suggest that the policy was not sufficiently effective.  Plaintiff alleges that Defendant did not comply with certain aspects of its anti-harassment policy, including implementing "interim measures," even after Plaintiff requested that it do so.  (ECF No. 8, ¶¶ 167, 235-37).  Thus, the *Faragher/Ellerth* defense does not warrant dismissal of Plaintiff's complaint.

### E. Constructive Discharge Claim

Defendant contends that Plaintiff's constructive discharge claim cannot stand because (1) it is not a standalone claim, and (2) she has failed to state a claim of constructive discharge.

---

[3] Because the *Faragher/Ellerth* defense is an affirmative defense, Defendant can only rely on facts that appear on the face of the complaint at this posture.  *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007).

Defendant is correct that a constructive discharge claim is not a standalone claim but instead may satisfy the adverse employment action element of a discrimination or retaliation claim. *See Crockett v. SRA Int'l*, 943 F.Supp.2d 565, 576 (D.Md. 2013). Even if it were properly pleaded as a freestanding cause of action, however, Plaintiff's constructive discharge claim would fail.

To plead a discrimination claim based on an alleged constructive discharge, "the plaintiff must show something more than the showing required for a hostile work environment claim." *Evans v. Int'l Paper Co.,* 936 F.3d 183, 193 (4th Cir. 2019) (internal quotation marks omitted). A constructive discharge claim requires a showing that the plaintiff "'was discriminated against by h[er] employer to the point where a reasonable person in h[er] position would have felt compelled to resign' and that she actually resigned." *Id.* (quoting *Green v. Brennan*, 578 U.S. 547, 555 (2016)). Courts look to "the frequency of the conditions at issue," and "[t]he more continuous the conduct, the more likely it will establish the required intolerability." *Id.* Further, "difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign*." Id.* The Fourth Circuit has advised that courts should consider "the totality of the circumstances" in determining whether a resignation was, in fact, a constructive discharge. *See Bodkin v. Town of Strasburg*, 386 F.App'x 411, 413 (4th Cir. 2010).

30

Plaintiff has not alleged sufficient facts to support a claim of discrimination based on constructive discharge. Although the incidents are mostly continuous during the time Plaintiff complains of, it cannot be said that the conditions were such that she had "no choice" but to resign. In fact, according to the Amended Complaint, a factor leading Plaintiff to resign was her desire to avoid losing retirement benefits, and she expected and hoped at the time to be re-hired and placed in a branch chief position. (ECF No. 8 ¶¶ 231, 238-240). This undermines Plaintiff's contention that her only choice was to resign. Furthermore, the circumstances here seem to be in line with, or fall short of, what the Fourth Circuit has rejected for constructive discharge claims. The Fourth Circuit explained in *Evans*, 936 F.3d at 193:

> [D]ifficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to resign. For example, in *Williams v. Giant Food, Inc.*, 370 F.3d 423, 434 (4th Cir. 2004), we held that being yelled at and told you are a poor manager and chastised in front of customers did not create conditions so intolerable as to compel a reasonable person to resign. In *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001), we held that ostracization and required counseling for turning in an inaccurate time card did not make the workplace intolerable. In *Munday v. Waste Management of North America*, 126 F.3d 239, 244 (4th Cir. 1997), we held that being ignored by co-workers and top management was insufficient to establish constructive discharge. And in *Carter v. Ball*, 33 F.3d 450, 459-60 (4th Cir.

> 1994), we held that being unfairly criticized,
> losing supervisory responsibilities, and
> having one's supervisor display a poster that
> may have been offensive to African Americans
> was insufficient to establish constructive
> discharge.

Accordingly, Plaintiff's constructive discharge claim will be dismissed.

### F. Retaliatory Investigation Claim

Count IV of Plaintiff's Amended Complaint alleges that Defendant retaliated against Plaintiff by initiating a retaliatory investigation into her through its Office of Inspector General ("OIG") after she resigned. Defendant argues that Plaintiff's retaliatory investigation claim in Count IV cannot stand because (1) she has not alleged sufficient facts or cited any law in support of her claim, and (2) the investigation was not "by her employer" and is therefore not covered by Title VII. (ECF No. 12-1, at 28-29). The second argument is unpersuasive because, as the Supreme Court has held, "[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).

Defendant is correct, however, that Plaintiff has failed to state a claim in Count IV. Plaintiff provides only one sentence in support of that claim: "After she resigned, the Agency persisted in its insatiable retaliation against Ms. Franovich, again

weaponizing its OIG to fabricate pretext for yet another retaliatory investigation of her." (ECF No. 8 ¶ 278). Not only is this statement almost entirely conclusory, but it also contains no tangible facts to assist the court in determining whether the allegation is plausible. For example, the Amended Complaint does not allege when exactly the investigation occurred, what the investigation involved, how it was initiated, what Defendant did to "weaponize" its inspector general's office, and what resulted from the investigation. The single, conclusory sentence does not meet the pleading requirements of Fed.R.Civ.P. 8. Thus, Count IV will be dismissed for failure to state a claim.

### G. Motion for Summary Judgment

Finally, Defendant contends that even if any of Plaintiff's claims cannot be dismissed on a motion to dismiss, the court should construe the motion as one for summary judgment. The court declines to do so. In her opposition to Defendant's motion, Plaintiff submitted a Rule 56(d) declaration listing multiple areas in which discovery is needed, including (1) corrective action taken by Defendant, (2) Defendant's knowledge of any alleged protected activity and any corrective action, and (3) the factual bases of the investigations into Plaintiff. (ECF No. 15-1 at 2). The declaration notes that no discovery has been had in this matter, and depositions of Mr. Dudek and other NRC officials will be necessary to support Plaintiff's claims. (*Id.* at 1-2).

Plaintiff is entitled to have an opportunity for discovery.  *See Works v. Colvin*, 519 F.App'x 176, 187 (4th Cir. 2013) (allowing a plaintiff to conduct discovery in a Title VII case in order to depose "the crucial decision-makers").  Accordingly, the motion for summary judgment will be denied.

**IV. Conclusion**

For the foregoing reasons, Defendant's motion to dismiss will be granted in part and denied in part.  Specifically, Defendant's motion will be granted as to Counts II (sex discrimination), III (constructive discharge), and IV (retaliatory investigation) and denied as to Count I (retaliation).  A separate order will follow.

<u>                                /s/                      </u>
DEBORAH K. CHASANOW
United States District Judge